**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

TAK SUN TAN,
          *Petitioner-Appellee,*

v.

DAVID L. RUNNELS, Warden; BILL
LOCKYER, Attorney General State
of California,
          *Respondents-Appellants.*

No. 04-55775

D.C. No.
CV-01-04281-
MMM

---

INDRA LIM,
          *Petitioner-Appellee,*

v.

DAVID L. RUNNELS, Warden; BILL
LOCKYER, Attorney General State
of California,
          *Respondents-Appellants.*

No. 04-55792

D.C. No.
CV-01-04177-
MMM

---

JASON FENG CHAN,
          *Petitioner-Appellee,*

v.

CHERYL K. PLILER, Warden,
          *Respondent-Appellant.*

No. 04-55815

D.C. No.
CV-02-04201-
MMM

OPINION

Appeal from the United States District Court
for the Central District of California
Margaret M. Morrow, District Judge, Presiding

Argued and Submitted
April 4, 2005—Pasadena, California

7895

Filed July 7, 2005

Before: Mary M. Schroeder, Chief Judge, Harry Pregerson,
and Stephen S. Trott, Circuit Judges.

Opinion by Judge Trott

## COUNSEL

Victoria B. Wilson, Deputy Attorney General, Los Angeles, California, for the respondents-appellants.

Janyce Keiko Imata Blair, El Segundo, California, for the petitioners-appellees.

David H. Goodwin, Los Angeles, California, for the petitioners-appellees.

## OPINION

TROTT, Circuit Judge:

Wardens Runnels and Pliler appeal the district court's decision to grant Jason Feng Chan's, Tak Sun Tan's, and Indra Lim's ("petitioners") petitions for habeas corpus pursuant to 28 U.S.C. § 2254. In ruling in favor of the petitioners, the district court — purporting to apply the standard of review required by the Anti-Terrorism and Effective Death Penalty Act (AEDPA) — found fault with the California Court of Appeal's decision to affirm the petitioners' convictions and conclusion that the prosecutor did not engage in prejudicial misconduct in the petitioners' joint trial by (1) arguing facts not in evidence, (2) presenting as true a fact that was false, and (3) appealing inappropriately to the jurors' passions and prejudices. Respectfully, we disagree with the district court

because we conclude without reservation that the state court's determination that there was no prosecutorial misconduct was not an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts, and we reverse the court's grant of the habeas petitions.

# I

## BACKGROUND

### A.

Dr. Haing Ngor — a man well-known for the tragic experiences he endured in Cambodia in the 1970s during the reign of the Khmer Rouge and for the Academy Award he received for portraying life under the Khmer Rouge in the movie *The Killing Fields* — was robbed and murdered in late February of 1996 while in his car in his Los Angeles carport. He was shot once in the chest and once in the thigh, and the killers stripped his body of his gold Rolex watch, and of the gold chain and locket he habitually wore around his neck and to which he was sentimentally attached. His car and its contents were untouched.

Chan, Tan, and Lim, all members of the Asian gang known as the Oriental Lazy Boyz ("O.L.B."), were charged with the robbery and murder of Dr. Ngor. They were tried simultaneously to three separate juries, the juries being separated on occasion for the presentation of evidence relevant to only one of the petitioners. Because the petitioners allege that the prosecutor committed prejudicial misconduct by (1) arguing "false facts," (2) arguing facts not in evidence, and (3) appealing to the jurors' passions and prejudices in his opening statements and closing arguments, the prosecutor's comments and the relevant evidence supporting them are recounted here in detail.

## B.

Petitioners were charged with first-degree murder and robbery. At the trial's commencement, the prosecutor separately delivered substantively identical opening statements to each of the three juries. In his opening statements, the prosecutor introduced Dr. Ngor as an acclaimed actor who won an Academy Award for his performance in *The Killing Fields*. The prosecutor described Dr. Ngor's life in Cambodia in the 1970s, stating:

> Dr. Ngor lived most of his life in Cambodia. He was a medical doctor, as the judge said, actually an obstetrician/gynecologist. He met a girl in Cambodia who he planned to start a family with. But things don't always work out as we plan.

> In the early 1970's [sic] a civil war was raging in Cambodia, and in April of 1975 that country was taken over by a group called the Khmer Rouge. This began the true life killing fields in which over a million Cambodians died.

> The Khmer Rouge ordered everyone into the countryside to work at manual labor. And they were especially harsh on intellectuals, including doctors. In fact, doctors were often killed simply for their profession.

> Dr. Ngor and his wife, Houy, were forced to work in the fields planting rice. There was little food, and starvation was very common. Dr. Ngor was tortured on three separate occasions, one time having part of his finger cut off. It was a time of incredible hardship and brutality. But life moved on, and one day Dr. Ngor and his wife discovered they were going to have a baby. Life seemed better. Once again, things don't always work out as we plan.

Complications developed with Houy's pregnancy. She went into labor, but she couldn't deliver their child. She needed a doctor, and Dr. Ngor was beside himself. He knew how to help his wife, but if he helped her the soldiers would know he was a doctor and they would kill him and his wife and their child. Dr. Ngor also lacked the instruments that were necessary to perform the surgery. So while his wife clung to life, Dr. Ngor rushed around trying to get help and instruments from the untrained doctors, but they were useless; and Dr. Ngor could do nothing to save his wife. While Dr. Ngor watched helplessly, his wife and their unborn child died.

Immediately after these comments, the prosecutor explained the relevance of Dr. Ngor's life in Cambodia to his murder. The prosecutor continued:

Now, you may be saying to yourselves, that's incredibly sad, that's incredibly tragic, *but what does that have to do with this murder case*? I'll tell you what it has to do with this murder case, ladies and gentlemen, because the tragedy didn't end there.

After his wife died, Dr. Ngor managed to save *the only picture he had of his wife*, a photograph from her identification card, and he had that photograph made into a locket once he escaped from the killing fields of Cambodia. He attached that locket to a 24-carat gold chain which he wore around his neck, always wore around his neck. His wife's photo was always with him. And ultimately, ladies and gentlemen, this photograph, *this picture that meant more to Dr. Ngor than anything in life, is why he died*, because Dr. Haing Ngor died, Dr. Haing Ngor was murdered, when he refused to surrender his wife's picture to these three gangbangers.

(emphasis added). The prosecutor explained his theory of the struggle over the locket in detail to each jury:

What happens is: As Dr. Ngor returns from [his friend's] house, he comes off Alpine and he turns north into the alley. . . . Dr. Ngor drives north, up the alley, almost to the top, where he turns right and parks his car in the carport of his apartment building. He shuts off his engine, opens his car door, ready to get out and walk to his apartment; but he never makes it, because what Dr. Ngor didn't know is that as he drove up the alley towards his home he passed the three [petitioners] . . . .

These three [petitioners] . . . had just finished smoking the last of their cocaine in the alley. They want more, but they need money. And at that precise moment Dr. Ngor drives right past them.

The [petitioners] see Dr. Ngor pull into the carport and they follow him. And as Dr. Ngor turns off his engine, the three [petitioners] approach him. They are planning to rob him to get money for more cocaine. And [petitioner] Chan has a gun, a 9-millimeter semiautomatic handgun, and he is ready to use it.

*The [petitioners] first demand Dr. Ngor's watch. He gives it to them, no problem.* But then the [petitioners] see Dr. Ngor's gold chain, the chain with the locket and the picture of his wife, the picture that meant so much to Dr. Ngor. *The [petitioners] demand the chain.* It is a thick gold chain and the gold will bring them plenty of money to buy more cocaine. *But Dr. Ngor refuses to give it to them, not this time, not again, and not to these three gang-bangers. After all he's been through, Dr. Ngor is not*

*going to give these three gangsters the only thing he has left of his wife. He refuses.*

So [Chan], . . . high on cocaine, shoots him. He aims his gun at Dr. Ngor and he pulls the trigger. The gun fires. The first bullet passes through Dr. Ngor's right leg. It misses the bone; it comes out the other side of his leg. It's a non-fatal bullet wound. But the second bullet is much more lethal. [Petitioner] Chan fires his second bullet directly into the side of Dr. Ngor's chest . . . .

Dr. Haing Ngor is dying. As Dr. Ngor gasps for breath, the [petitioners] snatch the chain from his neck. They then flee on foot, running down the alley, away from the murder scene . . . .

. . . .

Ladies and gentleman, Dr. Haing Ngor, who survived so much hardship, who survived torture, who survived the death of his wife and their unborn child, who survived the killing fields of Cambodia, the slaughter of a million of his fellow countrymen, dies on the cold pavement of a carport in Chinatown, *gunned down by this [petitioner] and his two fellow gangbangers for a few lousy rocks of cocaine.*

(emphasis added). After discussing the evidence he would introduce during the trial, the prosecutor finished his argument by stating:

And at the conclusion of all of the evidence it will be clear that this [petitioner], along with his two fellow gangbangers, robbed Dr. Haing Ngor and, when he refused to give up the picture of his wife, they shot him, they murdered him and they took it anyway.

That's what happened that night, ladies and gen-
tlemen. That's why Dr. Haing Ngor is dead, and this
is who killed him.

## C.

For the purpose of supporting the prosecutor's theory of the
central role of Dr. Ngor's 24-carat gold chain and heart-
shaped locket in his untimely death during the commission of
a robbery, the prosecutor called Sophia Ngor as his first wit-
ness. Sophia Ngor was Dr. Ngor's niece. She testified that
after her parents were murdered, she had been raised in Cam-
bodia during the war by Dr. Ngor and his wife, Houy. She tes-
tified that Dr. Ngor was "like a father to me." With regard to
Houy, Sophia explained to the jury the tragic circumstances
of Houy's death, an event and circumstances that explain in
turn Dr. Ngor's special and unusually strong emotional
attachment to his chain and locket containing a photograph of
his deceased wife which was missing from around his neck
after his death. We quote from her testimony:

> Q.  (By Mr. Hum, the prosecutor) Was your uncle
> a doctor?
>
> A.  Yes.
>
> Q.  What kind of doctor was he? Do you know?
>
> A.  He is a G.Y.N., gynecologist.
>
> Q.  Now, while you were living in Cambodia with
> your uncle and Houy, did something happen to
> Houy?
>
> A.  Yes.
>
> Q.  What happened to her?

A.   She was pregnant then and my uncle, he is a gynecologist, he tried to deliver the baby by himself; but, you know, during that time there is no medical equipment. And if they find out that he is a doctor, they will kill the whole family, you know, including his wife and everyone related. So he didn't [sic] successful and she died.

Q.   Now, after your uncle's wife died, did your uncle have a picture of her?

A.   *He only had one picture*, kind of I.D. card picture. Before the war she was a teacher and she got this I.D. picture. *You know, only one picture.*

Q.   Now, after your uncle's wife died, at some point later on did you and your uncle manage to escape from Cambodia?

A.   Yes.

Q.   And where did you go?

A.   We went to Thailand, border from Cambodia to Thailand.

Q.   And did your uncle do something with your aunt's picture once he got to Thailand?

A.   When he first got there, we stay in a camp. The camp had no shelter or anything. And about, I think, a week later we went to Bangkok, another refugee camp that they have shelter. As soon as he got there, he got a job, helping out the other refugees, like medical assistant and other things.

The Court:   What did he do with the photograph?

The Witness:    *Photograph, he went out of the camp to take to have a negative so he could have a print; you know, get a negative so he could do more things with it.*

Q.    By Mr. Hum: And after your uncle got the negative, *did he have something done with one of the pictures*?

A.    Yes. He make it to the pendant, the locket.

Q.    And do you remember when this was or what year this was that your uncle had the picture made into a locket?

A.    This, about 1979.

Q.    And this was in Thailand?

A.    Yes.

Q.    Now, what did your uncle do with the locket?

A.    He wear with — you know, he wear every day in the camp.

Q.    How did he have the locket attached?

A.    To the gold chain (pointing).

Q.    And you were gesturing around your neck.

A.    Long, like this (pointing), and the pendant here, like a heart-shaped pendant.

Mr. Hum:    Indicating around the neck area, your honor, like a necklace?

The Court:   Yes, sir.

. . . .

Q.   By Mr. Hum: Can you tell us about this neck-lace?

A.   It's make up [sic] from 24-carat gold, and the pendant also make up [sic] from gold, and the picture is inside. He have it added, the color, inside the picture. You know, he added the color. It was black-and-white picture, so he have it touched up with the color so he can make a pendant, look nicer.

Q.   Now, the necklace itself, the 24-carat gold, can you describe that for us, what it looked like, about how heavy it was, if you remember?

A.   It, you known, a regular chain, but different kind of design. It kind of round regular chain. In 24-carat gold, it weighs probably around maybe — it go by the Chinese weight. It probably worth about [$]2,000 to $3,000.

Q.   Now, this chain with the pendant, when you and your uncle were in the camps, did your uncle wear that pendant?

A.   Yes.

Q.   How often did he wear it?

A.   He wear it every day.

Q.   Did your uncle ever take that chain and pendant off in the camps?

A.   *Not in the camp because we didn't have a pri-vate home. We have like — they have like a bench,*

*you know, everyone would sleep in there. You take it out, you never find it again. So you just put it on.*

Q. Now, at some point from the camp did you come to the United States?

A. Yes.

. . . .

Q. And what year did you come to the United States?

A. 1980. April 1st, 1980.

Q. Do you remember how old you were?

A. I was — I think I was ten or 11. Yeah.

Q. And when did your uncle come to the United States?

A. 1981. Late '81.

. . . .

Q. And once your uncle came to the United States, did he still have the necklace and the pendant?

A. Yes.

Q. Okay. How often would you see your uncle when you came to the United States?

A. Every day.

Q. And tell us about the necklace and the pendant; how often did he wear it?

A.   He wear it daytime. At nighttime he would take it out and put on his desk. He have a study desk. He would take out his watch, you know, and the necklace, put on his desk. And every morning he go to shower and he get out and he put his watch on and his necklace.

Q.   Was that every single day?

A.   Every day.

Q.   Now, this watch that you talk about, can you tell us a little bit about that watch?

A.   It's a Rolex watch. He got it in Singapore. I think 1991 to '92 he purchased that watch in Singapore.

Q.   Now, where were you when your uncle was killed?

A.   I was in Cambodia.

Q.   Did you come back to the United States when you heard that your uncle was killed?

A.   Yes.

Q.   When you came back to the United States, did you go to your uncle's apartment?

A.   Yes.

Q.   Did you search through your uncle's entire apartment?

A.   Yes.

Q. Did you ever find the watch?

A. No.

Q. Did you ever find the pendant?

A. No.

Q. Did you ever find the necklace?

A. No.

(emphasis added).

Following Sophia's testimony, the prosecutor called Thommy Nou to the witness stand. The purpose of this testimony related to the charge of robbery in connection with Dr. Ngor's missing watch. Nou testified that he and his long-time friend Dr. Ngor spent Dr. Ngor's last day together in Long Beach, California, and that when Dr. Ngor departed in the early evening, he was wearing his gold Rolex watch.

As to the chain and locket, Samthoun Chittapalo testified that he saw his friend Dr. Ngor wearing it the day before the robbery murder.

### D.

The evidence that positively identified Tan, Lim, and Chan as the killers came primarily from an array of (1) percipient but fearful witnesses who lived in Dr. Ngor's neighborhood, and (2) O.L.B. gang members themselves. As noted by the district court, "three witnesses and their families chose to abandon Los Angeles . . . and move out of state because they were afraid of retaliation for testifying." The sufficiency of this evidence to link the petitioners to the robbery and murder of Dr. Ngor is not an issue in this case.

**E.**

The direct evidence pertaining to the petitioners' motives, intent, and purpose in confronting Dr. Ngor established that the petitioners were armed members of a dangerous outlaw gang, the O.L.B., who routinely "snatched," or robbed, valuable necklaces from unsuspecting victims. The petitioners converted their loot from these robberies into cash, which they used to support their drug habits. The petitioners' term for these robberies was "jacking," which included snatching purses and taking from their prey whatever other jewelry and valuables they might have on their person. An example of this telling evidence, as recounted by the California Court of Appeal, is the testimony of Donna Ekanha:

> In February 1996, [the month of the murder,] Donna Ekanha had been Chan's girlfriend, and she knew Lim and Tan. A few days or weeks before Ngor's killing, defendants and Ekanha were driving around Chinatown. They stopped and Tan jumped out, followed by Chan and Lim. Tan ran up to a girl and grabbed her from behind so she couldn't move, and then either Chan or Lim snatched her necklace. The defendants then went to a jewelry store in Chinatown to trade the necklace for money. Within the month before Ngor's killing, Ekanha had been in May's garage with all three defendants, who were smoking cocaine. When Ekanha asked Chan were he got the money to buy cocaine, he said "they would snatch," meaning "take a necklace from someone." Ekanha had also heard Lim say to Chan and Tan, "Let's go snatch."

We note here that the evidence did not establish that the petitioners routinely harmed or killed the victims of their snatches. This factor supports the reasonable inference that something unusual occurred during the robbery of Dr. Ngor, namely, resistance which provoked a deadly response.

## F.

As part of the defense, counsel called the lead detective in the case, Adalberto Luper, as a witness. It is clear from the record that one of counsel's purposes was to take issue with the notion that the photograph in the locket was the "only picture" Dr. Ngor had of Houy. Chan's attorney engaged Detective Luper in the following dialogue:

Q. (By Mr. Klein) Detective Luper, it is your theory that Dr. Ngor was murdered when he refused to surrender the picture of his wife?

A. Yes, it is.

Q. And it's your theory that that's the only picture he had of his wife?

A. The only picture that he had on his person. As to additional photographs of his deceased wife, I am not aware of any others.

Q. You sat here — I know you have been here through the entire trial, and you have sat through the opening statements, all three, correct?

A. That's correct. Yes, sir.

Q. And Mr. Hum, I guess, is articulating the theory that you have in this case?

A. I am certain that Mr. Hum and I share a similar theory regarding the case.

Q. And it is your position that Dr. Ngor was killed, I gather, because he wasn't going to give — and I am quoting here — "these three gangsters the only thing he had left of his wife"?

You remember that phrase, don't you?

A.   Yes, sir.

Q.   And by "only thing left of his wife," I gather you are speaking of that photograph?

A.   And the locket, yes, sir.

It turns out, however, that Detective Luper was aware of the photograph of Houy hanging on the wall in Dr. Ngor's apartment:

> Q.   *And when I was asking you those questions, you knew all the time that that photograph of his wife, identical to the locket, was sitting right up there; is that what you are saying?*
>
> A.   At the time of the search, Mr. Klein, I didn't know who that lady was.
>
> Q.   At the time I just got through asking you those questions, just a few minutes ago, you knew the photograph was there?
>
> A.   Did I know?
>
> Q.   Yes.
>
> A.   Certainly. But it is the same photograph that's in the book.
>
> Q.   Indeed.
>
> And you knew it all along?
>
> A.   I knew it when you asked me, yes.

Q. You just found out right now, didn't you?

A. What, that this photograph was on —

Q. That's right.

A. No, Mr. Klein. I have been in charge of this investigation since February of 1996, and I am aware of all the photographs that were taken; and certainly I am aware of this photograph.

Q. *And you knew that it was hanging on his wall when I just got through asking you those questions about whether you had found another photograph?*

A. *Mr. Klein, again —*

Q. *Is that yes?*

A. *— this is the same photograph that was in the book.* If you want to make it as another photograph, certainly there is another photograph. Here it is.

(emphasis added).

## G.

The prosecutor separately presented his theory of a homicide committed during a robbery to each jury for the second time in closing arguments. There, the prosecutor reminded the juries that "[t]his case is about the robbery and murder of Dr. Haing Ngor. This case is about the tragic death of a man who suffered unimaginable pain, unimaginable hardship, who escaped to our country seeking safety and a better way of life, who achieved success but never forgot those he left behind." After discussing the primary witnesses' testimony, the prosecutor continued:

This case is about what [the petitioners] did to that man. This case is about the fact that this crackhead O.L.B. gangbanger and his two homeboys robbed and murdered a wonderful human being when he refused to surrender *his most treasured possession*, his locket with the picture of his wife, *part of his past that he could never leave behind*. It's the one thing, ladies and gentlemen, that he would never give up; it's the one thing he was willing to die for, and he did.

(emphasis added).

Although each petitioner was represented by different counsel who gave separate closing arguments to the respective juries, each defense counsel delivered essentially the same argument. Specifically, they argued that the prosecutor was "just guessing" about what happened when Dr. Ngor was shot because there were no eyewitnesses other than the actual perpetrator, and that the prosecutor focused on Dr. Ngor's locket to appeal only to "sentiment, conjecture, sympathy, passion, prejudice, public opinion and public feeling." The defense emphasized also that the picture in Dr. Ngor's locket was not, in fact, the only copy of Dr. Ngor's late wife's picture. Finally, the defense focused on the import of its witnesses and their testimony about a car in the alley. According to the defense, that testimony established that there was a "getaway car driving away with other people unconnected with [the petitioners]." The defense argued that the evidence connecting their clients to the crimes was insufficient to support a conviction.

In rebuttal, the prosecutor summed up by stating:

Ladies and gentleman, this [petitioner] took the life of Dr. Haing Ngor. He was a doctor, he was an actor, he was an incredible man. *These [petitioners] tried to rob him of the most precious thing he had,*

*his gold locket, the one thing that meant everything to him.* That's what they tried to take. And when he wouldn't give it to them, ladies and gentlemen, these three [petitioners] killed him for it because to them it meant a few rocks of cocaine, and that's all that mattered.

Ladies and gentlemen, Dr Haing Ngor survived the killing fields of Cambodia where over a million people died just to be murdered in the killing streets of Los Angeles. He was murdered by [these petitioners], and he was murdered for a few lousy rocks of cocaine.

(emphasis added). The prosecutor ended with a call to justice. He stated:

Dr. Ngor never got justice for what was done to him in Cambodia, but justice is in our hands now, and let's make sure that he gets justice for what was done to him in Los Angeles.

Ladies and gentlemen, find [these petitioners] guilty because that's justice.

## H.

The petitioners appealed the verdicts to the California Court of Appeal on several grounds — only one of which is relevant here: prosecutorial misconduct. In particular, the petitioners alleged that the prosecutor committed misconduct in his opening statements and closing arguments by (1) appealing to the jurors' passions and sympathy by describing Dr. Ngor's life in Cambodia, (2) arguing the "fictionalized" story of the struggle over the locket, and (3) "falsely" stating that the locket contained the only picture of Dr. Ngor's wife. The Court of Appeal concluded that each of these claims was meritless because (1) the telling of Dr. Ngor's life story "was

relevant to People's theory of the case — that Ngor's extraordinary personal history would have made him resist [petitioners'] attempt to steal his gold necklace [and] [t]here [is] no prosecutorial misconduct in arguing this theory"; and (2) "[e]ven if the evidence at trial demonstrated there were other pictures of Ngor's wife," the prosecutor's theory focused on the loss of the locket itself and "it continued to be a reasonable inference from the evidence that the locket itself held great sentimental value for Ngor." For these and other reasons unconnected to this appeal, the Court of Appeal affirmed the petitioners' convictions.

## I.

The petitioners filed separate habeas petitions with the United States District Court for the Central District of California, but the petitions were ultimately assigned to the same district judge. On recommendation from a magistrate judge, that judge granted the petitions after concluding that (1) the prosecutor committed misconduct by arguing facts not in evidence and appealing to the jurors' passions, prejudices, and sympathy; and (2) the state court's decision concerning the prosecutorial misconduct allegations was contrary to and an unreasonable application of clearly established federal law. The petitions were consolidated for purposes of this appeal.

## II

## DISCUSSION

## A.

## STANDARD OF REVIEW

We review a district court's decision to grant habeas relief de novo. *Greene v. Lambert*, 288 F.3d 1081, 1089 (9th Cir. 2002). Because the petitioners' habeas corpus petitions are governed by AEDPA, and because the state appellate court

considered the petitioners' claim of prosecutorial misconduct on the merits, we may grant habeas relief only if the state court's decision is (1) "contrary to" or an "unreasonable application of[ ] clearly established Federal Law, as determined by the Supreme Court of the United States," or (2) based on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). This is a " 'highly deferential standard for evaluating state-court rulings' which demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997)).

The Supreme Court instructed in *Williams v. Taylor* that a state court decision is "contrary to" clearly established federal law "if the state court applies a rule that contradicts the governing law set forth in our cases" or "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." 529 U.S. 362, 405-06 (2000). The Court instructed that a state court decision is an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. Moreover, the Court explained that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* at 410. In other words, the "unreasonable application" inquiry is not subjective, *id.*, because it does not allow the reviewing court "to ultimately substitute[ ] its own judgment for that of the state court." *Woodford*, 537 U.S. at 25. Instead, a state court decision is an unreasonable application only if that application is "objectively unreasonable." *Williams*, 529 U.S. at 409.

## B.

## ANALYSIS

**[1]** With the deferential AEDPA standard in mind, we turn now to the merits of the petitioners' arguments. In evaluating the petitioners' allegations of prosecutorial misconduct on a writ of habeas corpus, *Darden v. Wainwright* instructs us that "it 'is not enough that the prosecutors' remarks were undesirable or even universally condemned[,]' [t]he relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " 477 U.S. 168, 181 (1986) (citations omitted). In other words, under *Darden*, the first issue is whether the prosecutor's remarks were improper and, if so, whether they infected the trial with unfairness.

### 1. The Photograph in the Locket

In order to evaluate the petitioners' claims that the prosecutor indulged in an improper appeal to the jurors' passions and sympathy that rendered their trial unfair, we must deal first with their claim that the prosecutor knowingly presented the juries with false evidence, i.e., that the locket contained the "only picture" of Dr. Ngor's wife. Petitioners now assert that because the photograph of Houy in the locket was merely a copy of the original, the prosecutor's characterization of it as the "only picture" was not only untrue, but a "deliberate deception." We note that the petitioners tendered this argument on appeal, but they did not present it as a legal question of any kind in the trial court. At the time of the trial, counsel made no objection that this evidence or assertion was false or misleading, and they did not charge the prosecutor in this regard with any form of misconduct. The record shows that counsel knew that other copies of the photograph existed, as revealed by Detective Luper's testimony for the defense. The record shows also — without ambiguity — that, armed with this knowledge, counsel chose not to object on this ground to

the prosecutor's opening statement, or to attempt to block Sophia's testimony as false or misleading. Instead, counsel chose as a trial tactic to attempt to attack this testimony and assertion on the evidentiary field of battle. How? By showing through Detective Luper that Dr. Ngor had another print of the photograph in his residence.

[2] After reviewing the record, it is apparent that the prosecutor's assertion that the locket contained the "only" picture of Dr. Ngor's wife was neither false nor part of deliberate deception. In fact, the record and Sophia's testimony — as quoted earlier — supports the statement that the picture *was* the only image of Dr. Ngor's late wife, i.e., the picture on his wife's teacher identification card, although other prints or copies of the image did exist. Sophia herself described the photograph in the locket as the "only picture" surviving Houy's death. Sophia explained that Dr. Ngor had a negative made of that picture after Sophia and Dr. Ngor left Cambodia so that he "could do more things with it." He took one of the copies of the only picture he had, touched it up with color, and made it into the locket. Because it is dispositive of this claim, we repeat Sophia's testimony on this point: "He only had one picture, kind of I.D. card picture . . . . You know, only one picture . . . . [H]e went out of the camp *to take to have a negative so he could have a print; you know, get a negative so he could do more things with it.*" In response to these answers, the prosecutor asked, "And after your uncle got the negative, did he have something done with *one of the pictures*?" Answer: "Yes, he make [sic] it to the pendant, the locket."

[3] The petitioners would have us overlook this portion of the record and narrowly construe the prosecutor's assertion in his opening statement as a deliberate falsehood. We decline this unsupported request. Rather, we understand that when the prosecutor referred to the "only" picture Dr. Ngor had of his wife, he meant — as did Sophia — that Dr. Ngor had only one image, not one copy, of the picture.

In context, we regard this "issue" as a failed attempt on appeal and in this petition to make something out of nothing. It boils down to a tempest over the meaning of "photograph," and whether the existence of more than one print of that photograph makes it false to say, as did Sophia, that one of the prints was the "only photograph" or "only picture." It is clear that Dr. Ngor had only one image of his wife. In any event, as we will explain, the trial court took great pains to educate the jurors that whatever the lawyers say is not evidence.

When examined in the light of this compelled reading of the record, it is apparent that the Court of Appeal's handling of this issue both factually and legally was not only not unreasonable, but demonstrably correct. The court said,

> (b) *Arguing facts not in evidence*.
>
> Related to the passion and prejudice argument, defendants argue that the very basis for the prosecutor's appeal to passion was false because *the locket did not in fact contain the only picture Ngor had of his wife*. But on our reading of the record, the prosecutor ended the trial by emphasizing the *loss of the locket itself*, rather than the loss of a unique picture inside the locket. Thus, during closing argument, the prosecutor asserted that Ngor "*refused to surrender his most treasured possession, his locket with the picture of his wife*," "wouldn't give up the most precious thing he owned, the locket with the picture of his wife," "would not give up the one thing that was most precious to him, the one thing that meant more to him than anything else in his life, and that was his locket with the picture of his wife," and asked jurors to remember "*how important that locket was to [Ngor] and how he never took it off*." Even if the evidence at trial demonstrated there were other pictures of Ngor's wife, it continued to be a *reasonable*

*inference from the evidence that the locket itself held great sentimental value for Ngor.*

(emphasis added). We do not perceive any fault in this analysis.

[4] Accordingly, because we discern no assertion or presentation of false facts, or any deception by the prosecutor, we conclude that this aspect of the petitioners' case has no merit.

## 2. The Prosecutor's Theory of the Struggle and References to Dr. Ngor's Life Story

As described by the California Court of Appeals, the petitioners ask us to grant them a new trial on the ground that

> the prosecutor made an overt appeal to the jurors' passions by arguing that this was a case in which a wonderful human being, a man who had survived one of the worst atrocities of the twentieth century and gone on to become a benefactor to his people, was senselessly murdered by crack-smoking gang members who were only interested in getting money for their next drug purchase. The prosecutor told jurors that Ngor had been tortured by the Khmer Rouge in Cambodia in the 1970's, which included having his finger cut off. Ngor had been unable to help his wife during a complicated pregnancy and, as a result, he lost both his wife and his unborn child. After Ngor escaped from Cambodia, he had a special locket made for the only photograph he had of his deceased wife. The prosecutor suggested that when the [petitioners] confronted him with a gun, Ngor willingly gave up his watch but refused to hand over his special necklace and locket, and was shot to death.

The Court of Appeal's resolution of this issue, which we review to determine whether it amounts to an unreasonable application of clearly established federal law, was as follows:

> It is generally true that an appeal to the jury to view the crime through the eyes of the victim is misconduct at the guilt phase of trial because an appeal for sympathy for the victim is out of place during an objective determination of guilt. (*People v. Arias* (1996) 13 Cal.4th 92, 160.) But while the prosecutor's rhetoric may have gotten a little overheated, it cannot be denied that the telling of Ngor's story was relevant to the People's theory of the case — that Ngor's extraordinary personal history would have made him resist [petitioners'] attempt to steal his gold necklace. There was no prosecutorial misconduct in arguing this theory.

Not only is this analysis far from unreasonable, it is correct, i.e., the locket's special and emotional place in Dr. Ngor's life story made his life story relevant to the prosecutor's theory of a robbery murder. As recognized by the district court, the charges of robbery required the prosecutor to disprove that Dr. Ngor was "simply shot and killed for no reason," and to prove instead — as articulated in the jury instructions — that the "murder occurred during the commission or attempted commission of a robbery." In turn, a robbery is the taking of "personal property from the possession of another, *against the will and from the person . . . , accomplished by means of force or fear*." (emphasis added). Dr. Ngor's locket was a treasured possession so valued, according to Sophia, for its sentimental value that he did not take it off in the camps of Cambodia for fear that it would be stolen.

> Q. (by Mr. Hum, the prosecutor) Did your uncle ever take that chain and pendant off in the camps?
>
> A. (by Sophia) Not in the camp because we didn't have a private home. We have like — they have a

bench, you know, everyone would sleep in there. You take it out, you never find it again. So you just put it on.

As the district court recognized,

> Here, competent evidence established that Petitioner and his co-defendants regularly used drugs, previously had robbed people of jewelry to buy drugs, had been in possession of a gun resembling the murder weapon, and had been in the alley at the time Dr. Ngor was killed. Thus, the prosecutor reasonably could infer that Petitioner and his co-defendants, after smoking cocaine in the alley, approached Dr. Ngor in his carport and then, in the course of robbing Dr. Ngor of his jewelry, murdered him. In addition, the prosecution presented evidence that, earlier on the night he was murdered, Dr. Ngor had been wearing his Rolex watch and the necklace and locket that contained a picture of his deceased wife (which held great sentimental value), but was found shot to death without the Rolex watch or the necklace and locket.

[5] We note that the evidence does not indicate that killing the victims of their robberies was part of the petitioners' modus operandi. So, the natural question arises, why did they kill Dr. Ngor? Was it political? Was it personal? Or was it a robbery gone bad, and if so, why? As did the Court of Appeal, we believe it undeniable that a reasonable inference from the facts and circumstances of this case is that Dr. Ngor's intense emotional attachment to his locket, an attachment arising from his compelling life story would cause him to resist turning it over to these thugs. Dr. Ngor's locket was a physical repository of part of his past which he would not easily relinquish. This reasonable inference directly supports the charge that the homicide occurred during the commission of a robbery, and not just for "no reason," or from a different motive.

Thus, Dr. Ngor's life story — to which no objection was made during the trial — was certainly relevant and supported by substantial evidence.

[6] In any event, the California Court of Appeal's rejection of this claim of prosecutorial misconduct was certainly not objectively unreasonable. According to *Viereck v. United States*, 318 U.S. 236, 247 (1943), if the purpose and effect of the prosecutor's emotionally charged appeal was "wholly irrelevant to any facts or issues in the case," then it "could only have been to arouse passion and prejudice." Here, because the statements and arguments in question were relevant, they fall outside the prohibited arena.[1]

## 3.   The Prosecutor's Statements and Arguments Did Not Infect the Trial with Unfairness

[7] Although we conclude that the Court of Appeal's conclusion about the prosecutor's representations to the jury was correct, and certainly not unreasonable, we have taken an in-depth look at the record to examine these issues through *Darden*'s prism that guards against "unfairness as to make the resulting conviction a denial of due process." 477 U.S. at 181. *Darden* measured the fairness of the petitioner's trial by considering, inter alia, (1) whether the prosecutor's comments manipulated or misstated the evidence; (2) whether the trial court gave a curative instruction; and (3) the weight of the evidence against the accused. 477 U.S. at 181-82.

Here, (1) the prosecutor did not manipulate or misstate the evidence; (2) the court gave multiple and timely protective instructions to the juries on these issues; and (3) as weighed

---

[1]We cannot fail to note here that section 352 of California's Evidence Code was available to the petitioners, a section that permits a court to weigh any prejudicial aspect of proffered evidence against its probative value in determining its admissibility. The defendants did not avail themselves of this protection.

and assessed by the Court of Appeals, the evidence against the petitioners was "not close."

Moreover, we presume jurors follow the court's instructions absent extraordinary situations. *Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985). Despite the petitioners' contention to the contrary, this is not an "extraordinary situation[ ]" where we can lay aside the "crucial assumption underlying our constitutional system of trial by jury that jurors carefully follow instructions." *Id.*

[8] In this connection, we discern five factors that convince us that no inappropriate damage occurred from the incidents the petitioners bring to our attention, i.e., that the references to Dr. Ngor's life story were kept to the relevant purpose for which the evidence was offered and admitted.

[9] First, during the process of jury selection, the court went to great lengths to innoculate the jurors against any inappropriate use of this evidence. The court used jury questionnaires for each of the three juries, advising each prospective juror in an introduction of the importance of the fairness and impartiality of jurors:

### JURY QUESTIONNAIRE
### DIRECTIONS

The integrity of our legal system depend[s] upon the fairness and impartiality of jurors. This questionnaire has been prepared to assist the Court and parties in determining whether or not you may have had personal experience or knowledge about the issues to be decided by the jury. Acquaintance with any of [the] parties, the lawyers or potential witnesses should also be disclosed.

In the questions themselves, Dr. Ngor's celebrity and notoriety was brought to the jurors' attention — at the request of

the petitioners. After noting that Dr. Ngor was the victim in the upcoming trial, the relevant questions asked were these: (1) "[d]id you, any family member, or close friend personally know Dr. Ngor?"; (2) "[d]id you know of Dr. Ngor?"; (3) "[h]ave you read any books and/or magazine articles about Dr. Ngor?"; (4) "[d]id you see the film "The Killing Fields" or any other film starring Dr. Ngor?"; and (5) "[h]ave you read, seen, or heard anything about this case?" If a prospective juror responded "yes" to any of these questions, the questionnaire provided ample space for the juror to explain his or her answer.

Although neither party has graced us with the actual voir dire that followed the assessment of these prophylactic questionnaires, we find enough in the record to demonstrate that Dr. Ngor's story was ventilated during this process, the purpose of which was to contribute to a fair trial. For example, as the court told the selected jurors,

> We talked about the case and we told you the victim in the case was Dr. Haing Ngor, that he received an academy award in the movie, "The Killing Fields." And we all talked and asked questions if that would make any difference how you feel about the case. You all expressed your opinion, said it would not make any difference, and it shouldn't make any difference who the victim is.

> Do we all agree to that?

> (The jurors answered in the affirmative.)

**[10]** Second, prior to opening statements, the court pre-instructed the jurors as to their responsibilities and duties, instructions designed to keep the jurors within the bounds of the evidence and away from any inappropriate behavior. In particular, the jurors were instructed (and they affirmatively answered that they understood) that their decision must be

based "on the facts and the law." They were told that (1) they would determine the facts "from the evidence received in the trial and not from any other source"; and (2) they must apply the law as the judge states it to them. The judge added:

> *You must not be influenced by pity for a defendant or by prejudice against him or her.* You must not be biased against the defendant because he or she has been arrested for this offense, charged with a crime or brought to trial. None of these circumstances is evidence of guilt and you must not infer or assume from any or all of them that he or she is more likely to be guilty than innocent.
>
> . . . .
>
> During the guilt phase of the trial *you must not be influenced by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling.* Both the people and the defendant have a right to expect you will conscientiously consider and weigh the evidence, apply the law and reach a just verdict regardless of the consequences.
>
> *Statements made by the attorneys during the trial are not evidence.*

(emphasis added).

**[11]** Third, the court repeated these admonitions during the trial. At one point following an opening statement by the defense, the court said,

> I am going to tell you again: what the lawyers say in a trial is not evidence. These are opening statements. Everybody says things, and it is how they are going to present their case. And then at the end of the trial when they argue, unless there was a stipula-

tion or evidence you have heard, they will argue the evidence. So you are the determiners of the — you are the people that determine whether or not the people have proved their case, and the facts come from this witness stand only.

Later, during the presentation of evidence, the court returned to this important theme:

> Let me remind you again — that is why we do it — opening statements are not evidence. What the lawyers say is not evidence. Remember to keep that understanding. What the press say may not be evidence. The evidence is going to be witnesses under oath. That is why we are so cautious and so careful.

**[12]** Fourth, at the end of the presentation of evidence and closing arguments by counsel, once again the court emphasized the jurors' duties to stay with the evidence and to eschew making any decisions fueled by inappropriate sentiments:

> You must base your decision on the facts and the law.

> You have two duties to perform. First, you must determine what facts have been proved from the evidence received in the trial and not from any other source. A fact is something proved by the evidence or by stipulation. A stipulation is an agreement between the attorneys regarding the facts. Second, you must apply the law that I state to you to the facts, as you determine them, and in this way arrive at your verdict and any finding you are instructed to include in your verdict.

> You must accept and follow the law as I state it to you, regardless of whether you agree with the law.

If anything concerning the law said by the attorneys in their arguments or at any other time during the trial conflicts with my instructions on the law, you must follow my instructions.

*You must not be influenced by pity for or prejudice against a defendant.* You must not be biased against a defendant because he has been arrested for this offense, charged with a crime or brought to trial. None of these circumstances is evidence of guilt, and you must not infer or assume from any or all of them that a defendant is more likely to be guilty than not guilty. *You must not be influenced by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling.* Both the people and the defendant have a right to expect that you will conscientiously consider and weigh the evidence, apply the law and reach a just verdict regardless of the consequences.

. . . .

*Statements made by the attorneys during the trial are not evidence.*

(emphasis added).

**[13]** Fifth, as to the disputed inferences regarding Dr. Ngor's reaction to being abruptly confronted by the petitioners that might be reasonably drawn from the evidence and his missing locket, the court gave specific instructions designed to ensure that such inferences would be kept within allowable limits and not represent the product of conjecture or speculation:

Evidence is either direct or circumstantial.

Direct evidence is evidence that directly proves a fact. It is evidence which by itself, if found to be true, establishes that fact.

Circumstantial evidence is evidence that, if found to be true, proves a fact from which an inference of the existence of another fact may be drawn.

An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts established by the evidence.

It is not necessary that facts be proved by direct evidence. They may be proved also by circumstantial evidence or by a combination of direct evidence and circumstantial evidence. Both direct evidence and circumstantial evidence are acceptable as a means of proof. Neither is entitled to any greater weight than the other.

However, a finding of guilt as to any crime may not be based on circumstantial evidence unless the proved circumstances are not only (1) consistent with the theory that the defendant is guilty of the crime, but (2) cannot be reconciled with any other rational conclusion.

Further, each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt. *In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt each fact or circumstance upon which — I'm sorry — each fact or circumstance on which the inference necessarily rests must be proved beyond a reasonable doubt.*

Also, if the circumstantial evidence as to any particular count permits two reasonable interpretations,

one of which points to the defendant's guilt and the other to his innocence, you must adopt that interpretation that points to the defendant's innocence and reject that interpretation that points to his guilt.

If, on the other hand, one interpretation of this evidence appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable.

(emphasis added).

To sum up, we are convinced that even if the prosecutor's statements were improper in the first place — which they were not — the trial court's numerous and thorough instructions eliminated any risk that the petitioners were denied due process.

## CONCLUSION

[14] Because the state court's determination that the prosecutor's statements were proper was not an unreasonable application of clearly established federal law and was not based on an unreasonable determination of the facts, we reverse the district court's decision to grant the petitioners' habeas petitions.

**REVERSED and REMANDED** with instructions to enter judgment in favor of the respondents.