**Crossan D. HOOVER, Jr., Plaintiff,**

v.

**Thomas L. CAREY, Warden.,
Defendants.**

**No. C 99–4568 JL.**

United States District Court,
N.D. California.

Sept. 7, 2007.

778

Nina Wilder, Weinberg & Wilder, San Francisco, CA, for Plaintiff.

Ronald S. Matthias, Dane R. Gillette, CA State Attorney General's Office, San Francisco, CA, for Defendants.

## ORDER GRANTING A WRIT OF HABEAS CORPUS

LARSON, Chief United States Magistrate Judge.

### I. Factual and Procedural Background

#### A. Court of Appeal Decision and Findings of Fact

Crossan David Hoover, Jr. was convicted June 22, 1984 of first degree murder, with use of a deadly weapon. Five days after his conviction, the jury found him to be legally sane. The California Court of Appeal, King, J., affirmed his conviction and the California Supreme Court denied review. The court of appeal found the facts to be as follows:

"The killing occurred within the context of a bizarre conspiracy, led by Mark Richards, for a paramilitary takeover of Marin County and creation of a modern-day Camelot with Richards as King Arthur and his crew of teenaged construction workers as his knights. Richards, a 29-year-old contractor, employed a number of teenagers, including 17-year-old Hoover. In regular meetings, Richards promoted his plan to isolate Marin County by destroying the Golden Gate and Richmond-San Rafael bridges and to defend the new kingdom through the use of laser guns placed on Angel Island and Mt. Tamalpais. The conspiracy was called Pendragon.

"Richards developed financial difficulties in mid-1982. He decided to kill his friend Richard Baldwin in order to obtain money. Baldwin was known to carry large amounts of cash.

"After failing in an attempt to solicit two of his followers to kill Baldwin, Richards turned to Hoover and another teenaged employee, Andrew Campbell. He told them Baldwin owed him money and was a "Nazi" and a "faggot," and it "would be a service to the public to get rid of such a

menace." The two agreed to participate in the killing in exchange for a share in the proceeds from the sale of property to be taken from Baldwin's house, as well as lodging in a remodeled portion of Richards' house. Hoover later stated he had expected to receive $5,000, a car, and a place to live.

"On July 6, 1982, Richards drove Hoover and Andrew to Baldwin's house to work on a construction job there. In the afternoon, pursuant to a plan devised by Richards, he asked Baldwin to show him and Hoover classic cars located in Baldwin's auto shop. The three left around 2 p.m. in Richards' truck. Andrew stayed behind and searched the house.

"At the shop, upon a prearranged signal from Richards, Hoover struck Baldwin on the head with a baseball bat. Hoover then stabbed Baldwin in the head with a screwdriver and in the chest with a chisel.

"Richards and Hoover returned to Baldwin's house. With Andrew, they took $3,000 in cash and various other items from the house, including guns and marijuana. Later that day Richards bought a boat, using Baldwin's' money to make a down payment. he and the two teenagers retrieved Baldwin's body from the auto shop and used the boat to dump the body in San Francisco Bay.

"Over the next few days Hoover admitted the killing to several persons. Baldwin's body was found on July 13. The next day the Marin County Sheriff's Department received an anonymous telephone call which led to the arrest of Hoover and Richards on July 16." *People v. Hoover*, 187 Cal.App.3d 1074, 1078, 231 Cal.Rptr. 203 (1986), rev. denied February 25, 1987.

The judgment was affirmed on appeal and the California Supreme Court denied state habeas relief, although arguably not on all claims contained in this federal habeas petition.

## B. Habeas Petition

Hoover filed, *pro se*, a petition for writ of habeas corpus on October 14, 1999. The parties consented to this Court's jurisdiction pursuant to 28 U.S.C. § 636(c) and Civil Local Rule 73. Respondent moved to dismiss, as the petition was filed after the expiration of the one-year limitation period set forth in 28 U.S.C. § 2244(d). This Court in its order filed September 26, 2002 (Docket Number 21) held that Hoover was entitled to equitable tolling, and also to appointed counsel, if he qualified financially, due to the complex procedural and legal issues of the case, as well as Hoover's limited education and possible learning disabilities.

This Court concluded that equitable tolling was warranted based on Hoover's lack of access to his case files or to the trial record between April 1996 and the summer of 1998. His attorneys had ignored his pleas for his files and the records at the Marin County Courthouse had been destroyed in a flood and had to be reconstructed from microfiche.

This Court, therefore, unconditionally rejected Respondent's motion to dismiss the petition on the grounds of untimeliness and directed Hoover to prepare and submit a Financial Affidavit to verify his eligibility for appointed counsel.

Respondent did not appeal the Court's denial of its motion to dismiss Hoover's petition as untimely.

## C. Motion to Strike

Initially the case was referred to the Federal Public Defender to represent Hoover but panel counsel was appointed September 24, 2003 and began reviewing the voluminous file. Hoover's appointed counsel filed an amended petition on July 13, 2005. The petition raised several claims that had not been raised in the

original petition. Respondent moved to strike those claims as untimely and not relating back to the original petition.

The Court by its order of December 12, 2005 struck from the amended petition Hoover's claim of ineffective assistance of counsel for failure to plea bargain and for failure to appeal the trial court's denial of a motion for a change of venue and for the trial court's failure to hold a hearing on a juror's fitness to deliberate or to seat an alternate juror during the sanity phase of his trial. The Court struck all these claims based on their not relating back to exhausted claims in the original petition. The Court issued an order to show cause.

Respondent filed an answer and supporting exhibits June 20, 2006. Hoover filed a Traverse September 11, 2006. After a status conference in early 2007 the parties briefed issues for an evidentiary hearing. The Court conducted a hearing on April 30, 2007. The parties argued their respective positions but presented no new evidence.

### D. Amended Petition

Hoover was able to maintain the following cognizable claims: 1) the State violated his due process rights by giving an incorrect jury instruction on sanity; 2) Hoover received ineffective assistance of counsel because his attorney failed to object to the prosecution's inconsistent theories and manipulation of the prosecution expert's testimony. 3) the State violated his due process rights by using inconsistent theories in the successive trials of Hoover and his codefendant Richards; and 4) the State violated his due process rights by withholding evidence from its expert witness to manipulate the expert's testimony.

## II. Standard of Review

### A. Generally

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The writ may not be granted with respect to any claim that was addressed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

■ The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. *Clark*, 331 F.3d at 1069.

■ Furthermore, habeas relief is available where the state court of appeal fact-finding is unreasonable, by clear and convincing evidence. A "determination of a factual issue made by a State court shall be presumed to be correct. The applicant

shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). The "presumption of correctness is equally applicable when a state appellate court, as opposed to a state trial court, makes the finding of fact." *Sumner v. Mata*, 455 U.S. 591, 592–593, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982); *Norton v. Spencer*, 351 F.3d 1, 6 (1st Cir.2003).

 Clear and convincing evidence is evidence which produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is "highly probable." *Colorado v. New Mexico*, 467 U.S. 310, 316, 104 S.Ct. 2433, 81 L.Ed.2d 247 (1984). Only after a petitioner successfully rebuts the presumption of correctness by clear and convincing evidence may the court determine if the resulting decision was based on an unreasonable determination of the facts. *Miller–El v. Cockrell*, 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). Therefore, it is possible that a state court finding is incorrect but not unreasonable.

### B. Application to this case

 1. **Jury Instruction**—If the state court disposed of a constitutional error as harmless under an appropriate standard of review, federal courts must, for purposes of application of the "unreasonable application" clause of § 2254(d)(1), first determine whether the state court's harmless error analysis was objectively unreasonable. *Medina v. Hornung*, 386 F.3d 872, 878 (9th Cir. 2004). If the federal court determines that the state court's harmless error analysis was objectively unreasonable, and thus an unreasonable application of clearly established federal law, the federal court then proceeds to the *Brecht* analysis. *Id.* at 877. Analysis under the "contrary to" clause of § 2254(d)(1) is not affected by this rule. *Id.*

2. **Ineffective Assistance of Counsel**—Subject to the general standard.

3. **Inconsistent theories**—Prosecutorial misconduct is cognizable in federal habeas corpus. The appropriate standard of review is the narrow one of due process and not the broad exercise of supervisory power. See *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).

4. **False evidence**—Hoover did not raise this issue on direct appeal but did present it in his state habeas petition. The California Supreme Court denied relief. (Exhibit 8 to Answer to Amended Petition). The state court order cited five California Supreme Court decisions, all of which relate to state procedural defaults, and it is arguable that the Supreme Court did not reach the merits of this claim. In such cases the deference standard of § 2254(d) does not apply and the federal court on the habeas petition conducts a de novo review. *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir.2002); *Menendez v. Terhune*, 422 F.3d 1012, 1026 (9th Cir.2005).

### III. Claims and Analysis

**A. The State violated Hoover's due process rights by giving an incorrect jury instruction on sanity; error was not harmless—jury was reasonably likely to have reached a different result had it been given the correct instruction; state court decision was based on an unreasonable construction of the facts.**

Hoover argues that the jury instructions given on the issue of insanity were incorrect and deprived him of a fair trial. The jury found he was legally sane at the time of the commission of the crime (RT: 2821).

### 1. Incorrect Insanity Instruction under *Skinner*

 The trial court gave this instruction (CALJIC 4.0):

"A person is legally insane when by reason of mental distress (sic) or illness he was incapable of knowing or understanding the nature and quality of his act and incapable of distinguishing right from wrong at the time of the commission of the offense." (RT:[1] 2790:27–28—2791:1–3)

In addition, the written instruction was sent into the jury room during deliberation:

"A person is legally insane when [by reason of mental disease or mental defect] he was incapable of knowing or understanding the nature and quality of his act and incapable of distinguishing right from wrong at the time of the commission of the offense." (CT:[2] 457; CT: 463–465)

 A jury instruction may be incorrect under state law and yet not a basis for habeas relief. *Estelle v. McGuire,* 502 U.S. 62, 71, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). The only question for the federal court is "whether the ailing instruction itself so infected the entire trial that the resulting conviction violates due process.'" *Id.* at 72, 112 S.Ct. 475 (quoting *Cupp v. Naughten,* 414 U.S. 141, 146–147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973)). The definition of an insanity defense is therefore a state-level decision, but is reviewed within the outline of the Constitution. *Leland v. State of Oregon* 343 U.S. 790, 801, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952).

California voters adopted an insanity defense through Proposition 8 in 1982, incorporated as California Penal Code § 25(b). The voter initiative reinstated a two-prong *M'Naghten* test for insanity: "[T]his de-fense shall be found only when the accused person proves by a preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act and of distinguishing right from wrong." Cal.Pen.Code § 25(b). This standard was characterized by some as the "drooling idiot" or "wild beast" criterion for insanity, that a defendant must have sunk to the level of an infant or an insentient animal to be found legally insane.

The California Supreme Court later held that the conjunctive test, in which both prongs of the test must be proved by a preponderance of the evidence, was not the electorate's intent, and held that the test should be used disjunctively, such that a defendant need only prove one of the prongs. *People v. Skinner,* 39 Cal.3d 765, 777, 217 Cal.Rptr. 685, 704 P.2d 752 (1985). The court held that the conjunctive test would have returned the insanity defense to the days when an accused could be found insane only if he was " 'totally deprived of his understanding and memory, and doth not know what he is doing, no more than an infant, than a brute, or a wild beast.' " *Id.* (quoting *Rex v. Arnold,* 16 Howell St. Tr. 695, 765 (1724)).

The statutory, conjunctive definition of insanity was in effect at the time of Hoover's trial, but *Skinner* had been decided by the time of his direct appeal. The instruction was correct as a matter of law at the time it was given, but the court of appeal considered Hoover's claim of prejudice due to the jury instruction on insanity. The court reasoned that reversal on the insanity issue is required only if it is reasonably probable that a finding of insanity would have been made absent the error. *People v. Leever* (1985) 173 Cal.App.3d 853, 869, 219 Cal.Rptr. 581; *People v. Wat-*

---

**1.** Reporter's Transcript

**2.** Court Transcript

*son* (1956) 46 Cal.2d 818, 836, 299 P.2d 243, cert. denied in *Watson v. Teets,* 355 U.S. 846, 78 S.Ct. 70, 2 L.Ed.2d 55 (1957).

The court of appeal noted that both the Attorney General and Hoover agreed that the test in *Watson* applied. That is: "[t]hat a 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." *Id.*

In Hoover's case the court of appeal relied on something Hoover told a clinical psychologist in September 1982, two months after the killing:

"It was like [Richards] was coaching me. He would listen to what I said and push me on. When I was with Baldwin, I kept thinking this is the guy standing between me and the money. It made me excited. I thought about guns I could buy and all the other stuff. *I knew it was wrong, but I didn't give a shit.* Did you ever think of getting $5,000? Did you ever think of wanting to be with your mother? My mother could come back to Marin County. I could have my own room so I wouldn't have to look at her all the time. Oh, man. I was just thinking of how happy I'd be, how much love I would get, how many things I'd have." (Emphasis added)

*People v. Hoover,* 187 Cal.App.3d at 1082, 231 Cal.Rptr. 203.

The court of appeal concluded, "This admission of contemporaneous knowledge of wrongfulness clearly demonstrates Hoover was capable of distinguishing right from wrong at the time of the killing, and the prosecutor made it a fundamental part of his closing argument on the insanity issue." *Id.*

The court of appeal characterized a defense expert as "equivocal on the 'right from wrong' issue." *Id.*

"When defense counsel first asked whether Hoover was capable of distinguishing right from wrong at the time of the killing, the witness answered only that 'I'm not sure I could answer that except to say that he—what he was doing, he felt, was right. He had been conditioned for that.' When counsel repeated the question the witness answered, 'Well, I'm sure he wasn't even thinking of that at the time of the act.' This was followed shortly by the following colloquy: [The witness] 'I'm of the opinion that he was conditioned not to be thinking about those sorts of things. That he was conditioned to feel at a gut level that what he was doing was necessary.' [Defense counsel] 'So based upon that conditioning, would it be your answer to the question that he did not know that he was doing was wrong?' [The witness] *'Under those circumstances,* yes.' (Emphasis added.) On cross-examination, when confronted with Hoover's prior admission that 'I knew it was wrong, but I didn't give a shit,' the witness never denied that the statement indicated contemporaneous awareness of wrongfulness, but simply emphasized the part of Hoover's statement that referred to coaching by Richards.

"Thus the defense expert never asserted unequivocally that Hoover was incapable of distinguishing right from wrong at the time of the killing. The witness was unequivocal only to the extent he asserted Hoover was 'conditioned' not to think about right and wrong but instead to feel that the killing was 'necessary.' The expert's single assertion of unawareness of wrongfulness was qualified by the phrase 'under those circumstances,' apparently referring to such conditioning. This was not an assertion

of *incapability* of distinguishing right from wrong, but simply one of conditioning not to think about it. *Id.* at 208 The court rejects the defense expert's testimony as equivocal, especially in light of Hoover's statements demonstrating "contemporaneous awareness of wrongfulness," concluding that "it is not reasonably probable the jury found Hoover was incapable of distinguishing right from wrong at the time of the killing. The instructional error was harmless." *Id.*

The court of appeal analyzed only the second prong of the M'Naghten test—whether Hoover knew right from wrong. The court glossed over the question whether he failed to appreciate the nature and quality of his actions by summarily dismissing testimony that he was temporarily psychotic, delusional and hallucinating at the time of the killing.

The court of appeal found that the only issue on appeal was whether it was reasonably probable the jury found Hoover was incapable of distinguishing right from wrong at the time of the killing. The court cited the following reasoning in *Leever*. "First, had the jurors been persuaded that [defendant] did not know the nature and quality of his act ..., the instruction [requiring both elements] would have been harmless as a matter of law, for 'a person who is unaware of the nature and quality of his act by definition cannot know that the act is wrong. In this circumstance the 'nature and quality' prong subsumes the 'right and wrong' prong. Thus the only potential harm in the instruction would be the converse situation—that is, if they found that he did not know his act was wrong but nevertheless found him sane because they believed that he knew the nature and quality of his act." 173 Cal. App.3d at 869, 219 Cal.Rptr. 581 (internal citations omitted)

## 2. Error was not harmless

If the state court disposed of a constitutional error as harmless under an appropriate standard of review, federal courts must, for purposes of application of the "unreasonable application" clause of § 2254(d)(1), first determine whether the state court's harmless error analysis was objectively unreasonable. *Medina v. Hornung*, 386 F.3d 872, 878 (9th Cir.2004). If the federal court determines that the state court's harmless error analysis was objectively unreasonable, and thus an unreasonable application of clearly established federal law, the federal court then proceeds to the *Brecht* analysis. *Id.* at 877. Analysis under the "contrary to" clause of § 2254(d)(1) is not affected by this rule. *Id.*

The court of appeal concluded that the jury was unlikely to have found Hoover to be legally insane, despite the improper instruction, due to the evidence that he knew right from wrong. The court of appeal found the improper jury instruction harmless because the weight of evidence in favor of Hoover's sanity was so great. Accordingly, the court of appeal found the conjunctive instruction was not prejudicial and therefore the error was harmless.

This is deeply troubling, in light of the evidence of Crossan Hoover's psychological turmoil before the killing, the influence of Richards and the Pendragon fantasy over him, and the stark evidence of his disconnection from reality at the time of the killing itself.

Hoover's ability to orient to reality had been a long-term struggle, interspersed with psychotic and violent outbursts, hallucinations, and suicidal introversion, culminating in an attachment to a manipulative cult leader promising escape from a world of disillusionment. By 1981, two years before Baldwin's death, Hoover's sixteen-year life history had formed a pattern Dr.

Marian Saunders, his school psychologist, recognized and anticipated would lead to disaster. Michael Bodkin, for seven years a youth counselor, confirmed emotional encounters with this 'unsophisticated' Bay Area teenager; he expressed deep concern to Marian Saunders and the Probation Department supervisor, describing Crossan Hoover as "one of the most disturbed kids" he had ever seen. (Appellant's Opening Brief:[3] 39–42; 36:11–12)

Hoover's own account of the killing is chilling evidence that he was out of touch with reality when he killed Baldwin. He testified that Baldwin continued to talk to him, after he struck him in the head with a baseball bat. So he hit him again. And again. And again—four times in all. Then he stabbed him in the chest with a chisel and in the eye with a screwdriver. In fact, Dr. Harold Brazil, the state's pathologist, testified that his autopsy revealed only a single blow to the head, the probable cause of Baldwin's death. RT: 438–440; 457–458; CT: 18; See RB[4] 16, fn. 7; 7:16–17). Significantly, given Hoover's testimony that he stabbed Baldwin in the eye with a screwdriver, and that Baldwin continued to talk after the blow to the head, Dr. Brazil stressed that there were no detectable signs of trauma to the face or eyes, which would have been discernible during his examination of the body. (RT: 457–460; CT: 24) It simply didn't happen the way Hoover described it.

This evidence undermines the first prong of the *M'Naghten* test because it presents "serious challenge" to the notion that Hoover had the mental capacity to form specific intent—how could he if he was unable to appreciate the nature and quality of his act? Respondent contends that Hoover struck Baldwin several times with the bat. Presumably this inference relies on what Hoover told Dr. Ramon Rodriguez, that he hit Baldwin a number of times with the baseball bat because Baldwin kept talking to him after the first blow; he said he then stuck a screwdriver into Baldwin's eyes to pierce his brain, presumably to stem the flow of words. (RT: 2264–2265) Hoover's recollection of Baldwin's injuries does not jibe with Dr. Brazil's autopsy report. ( RT: 438–440; 457–460).

Dr. Rodriguez and Dr. Gould both raised the specter of hallucinations at work. Hoover could have entered into a transient psychotic state as he delivered the fatal blow to Baldwin upon Richards' command, hallucinating what was happening, rather than perceiving it accurately. (RT: 2264–2266). Even though Hoover may have discussed the plan to murder Baldwin before and after it occurred, it is far from certain that he appreciated the nature and quality of his actions as they were happening. (Ex. 2 to Respondent's Exhibits in Support of Answer to Amended Petition—Respondent's Brief on Appeal: 13, 24; Cf., Ex. 1 to Respondent's Exhibits in Support of Answer to Amended Petition—Appellant's Opening Brief on Appeal: 41)

Neither Dr. Gould nor Dr. French rendered an opinion at the sanity phase as to whether Hoover was capable of appreciating the nature and quality of his act, or if he could distinguish right from wrong at the time of the killing. Dr. Gould did testify that Hoover lacked "an appreciation of what was happening." (RT: 1948:25–26) Nevertheless, the defense's objection to his ultimate opinion on Hoover's sanity was overruled. (RT: 1949), and Dr. Buehler offered his opinion, uneducated as to Pendragon, in rebuttal. (RT: 2422) La-

---

**3.** Appellant's Opening Brief on Appeal—Exhibit 1 to Respondent's Answer to Amended Petition

**4.** Respondent's Brief on Appeal—Ex. 2 to Respondent's Answer to Amended Petition

bels to fit Hoover's psychological spectrum of problems are severe enough to explain the inconsistencies in the mental health professionals' conclusions about him. All considered him to be deeply troubled. Even Dr. Buehler admitted that his opinion might have been entirely different had he fully considered the impact on Hoover of his entanglement with Mark Richards and with Pendragon. Amended Petition 51:17–22; RT: 2483:2–3.

Hoover believed he was obliged to kill Baldwin out of loyalty to Richards and his duty as a believer in the Pendragon cult. If a defendant is compelled by psychological infirmity to believe that he or she is "ordained [to] the commission of a crime, we think it cannot be said of the offender that he knows the act to be wrong." *People v. Skinner*, 39 Cal.3d 765, 783, 217 Cal.Rptr. 685, 704 P.2d 752 (1985).

In that case Jesse Skinner believed God had instructed him to kill his former wife because He had commanded "the marriage vow 'til death do us part' bestows on a marital partner a God-given right to kill the other partner who has violated or was inclined to violate the marital vows." *People v. Skinner*, 39 Cal.3d 765, 770, 217 Cal.Rptr. 685, 704 P.2d 752. Even a homicidal act based upon such a belief must be judged legally void as the product of a mind incapable of distinguishing moral right from wrong. *Id.*, at 783, 217 Cal. Rptr. 685, 704 P.2d 752. For the same reason, if Crossan Hoover believed his act was justified because, through a combination of severe psychological pressures, he perceived Pendragon as a viable means to free himself, a jury could reasonably conclude that he did not have the moral capacity to appreciate the moral wrong of taking another's life in pursuit of those needs.

Given the testimony by Dr. Rodriguez that Hoover did not appreciate the nature of what happened and Dr. Buehler's admission that he would likely have testified differently, had he known about Pendragon and of Mark Richards' influence over Hoover, it is reasonably probable that the jury would not have found Hoover legally sane if the defective instruction hadn't been given. It is reasonably probable, absent the error of the 'drooling idiot' or 'wild beast' instruction, and without the distortion in the weight of the evidence caused by the prosecution's withholding evidence from Dr. Buehler, the jury would have reached a different verdict on Hoover's sanity.

### 3. Conclusion that error was harmless was based on an unreasonable construction of the facts

The court of appeal set out two key factors which it believed to demonstrate an absence of prejudice of the improper jury instruction on insanity: (1) Hoover's own comments several months after the killing, indicating an awareness at the time of the killing that the act was wrong, and (2) the equivocal nature of testimony by the only defense expert to testify on the sanity issue.

This Court disagrees and finds that this conclusion is founded on an unreasonable construction of the facts. 28 U.S.C. § 2254(d)(2). The conclusion that the erroneous instruction was harmless rested on two factual premises: first, that Hoover's comments several months after the killing in fact reflected his awareness at the time of the killing that his acts were wrong; and second, that only a single defense expert, Dr. Roman Rodriguez, opined on the sanity issue and that his testimony was equivocal on that point. *People v. Hoover*, 187 Cal.App.3d 1074, 1080, 231 Cal.Rptr. 203 (1986). These findings are not supported by a fair reading of the record.

A state court's determination of a factual issue is entitled to a presumption of

correctness under 28 U.S.C. § 2254(e)(1). *See Rushen v. Spain*, 464 U.S. 114, 120, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983). Federal courts must defer to state court factual findings "in the absence of 'convincing evidence' to the contrary," ... and may set them aside only if they "lac[k] even 'fair support' in the record." *Marshall v. Lonberger*, 459 U.S. 422, 432, n. 8, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983); *Wiggins v. Smith*, 539 U.S. 510, 528, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (petitioner has the burden of overcoming the presumption of correctness by clear and convincing evidence.) This stringent standard is met here.

The state court's findings reflect an improper and prejudicial selectivity. In the first place, the analysis ignored the overwhelming evidence of legal insanity that was presented throughout the entire trial, focusing instead on only two pieces of testimony in isolation from the rest. To avoid needless repetition, the parties had agreed and the trial court concurred that the jury at the sanity stage should be instructed to consider all of the evidence introduced at both phases of the trial. ( RT: 2265–2267). Defense counsel's opening statement in the sanity phase stressed the importance to the jury of considering all of the evidence in the case. In closing, both sides relied, without distinction, on evidence presented at both stages of the trial. On appeal, however, the court disregarded virtually all the testimony adduced by the defense at the guilt phase. As a result, the court substantially overstated the significance of one of the many post-offense statements Hoover made, and grossly underrated Dr. Rodriguez' confidence in his opinion that Hoover was legally insane.

The court placed the greatest emphasis on one of Hoover's statements to a clinical psychologist in September, 1982. In describing the circumstances leading to the killing, Hoover stated, "It was like [Rich-ards] was coaching me. He would listen to what I said and push me on. When I was with Baldwin, I thought about the money. It made me excited. I thought about the guns I could buy and all that stuff. *I knew it was wrong, but I didn't give a shit* .... Oh, man, I was just thinking how happy I'd be, how much love I would get, how many things I'd have." (Emphasis added.) The court treated this statement as a conclusive admission that Hoover knew right from wrong at the time of the killing.

That, however, was not the conclusion drawn by Dr. French, the clinical psychologist who conducted the interview. (Petitioner's Supplemental Exhibit F.) Indeed, Dr. French's notation immediately after the quoted statement was: "As these verbatim quotes suggest, Crossan became *almost psychotic* at this point in the interview." (Petitioner's Supplemental. Exhibit F, 6) (emphasis added).

The statement selected by the court was only one of the many emotionally-charged revelations made to Dr. French during that six-hour examination. Dr. French observed that, "Whenever he discussed Richards, Pendragon, or the murder, a torrent of loosely associated themes would pour from his mouth. Violence, homosexuality, mother, and power became all jumbled as he rambled on .... Crossan became more and more grandiose and emotionally loose as he proceeded with this story." When asked about his reaction to the proposal that he kill Baldwin, he replied:

"I was just shocked for a minute, he began telling me Baldwin was a homosexual, a rapist. Later when I was driving down the street with Baldwin, he was looking at kids, staring at them, talking about them. It turned my insides inside-out, it makes me angry—I don't like that—I can't handle those kind of people. It makes me sick, man.—why

the hell do they do that. It made me get more angry at him and I didn't even know him." [5]

Following the interview, Dr. French administered an array of standard psychological tests to Hoover. He concluded as follows: "Test data clearly indicate that Crossan is suffering a major degree of disabling psychopathy. These data confirm interview impressions that Crossan can become transiently psychotic in times of emotional stress. In fact, such stress need not be especially intense. He seems particularly vulnerable to any encounters related to violence, sexuality, or his parents. He presents compelling evidence of poor reality-testing, distortion of the ideational process, loose emotional controls, and poor problem solving ability .... Crossan was probably not 'sane' at the time of the murder."

In ignoring both the context of the statement and Dr. French's contemporaneous observations, the state court seriously distorted the record and the meaning of Hoover's words. Accordingly, the presumption of correctness must yield as to the finding that Hoover admitted knowing right from wrong at the time of the killing and that his unvarnished statement should be taken as conclusive. The court's obligation to examine the nuances and context of such a statement in a mental state defense is much more extensive.

The court's characterization of Dr. Rodriguez's testimony as "equivocal on the right and wrong issue" reflected the same overly selective parsing of the record. While the state court was technically correct in describing Dr. Rodriguez as the only witness who testified for Hoover at the sanity trial, that was not the only evidence presented by the defense. By agreement and instruction, the evidence at the sanity trial encompassed all the expert testimony adduced by the defense in the guilt phase as well.

At the guilt phase, one clinical psychologist, Dr. French, two psychiatrists, Drs. Gould and Rodriguez, and a number of other mental health professionals testified about Hoover's propensity for psychotic dissociation under stress. Most of these experts also spoke of Richards' controlling influence over Hoover—his manipulation of Hoover's rage and his fantasies of reuniting with his mother. To fairly reflect the record and Dr. Rodriguez's opinion, all this evidence had to be taken into account.

Instead, the state court focused only on Dr. Rodriguez's testimony in the sanity phase. The court regarded as equivocation Dr. Rodriguez's sincere efforts to relate Hoover's diagnosis and symptomatology to the legal insanity test—the wrong test, at that. Any fair reading of his trial testimony shows that Dr. Rodriguez had concluded unequivocally that (1) Hoover was transiently psychotic and hallucinatory

---

**5.** Following his conviction, Hoover was referred to the Department of Youth Authority for an evaluation of his amenability to the training and treatment under Cal. Welfare and Institutions Code § 707.2 In the course of the interview for the Social History section of the evaluation, Hoover was asked about the worst experience he had in his life. He reported that "he was raped at the age of twelve by an older brother of a friend. This only occurred one time (he was sodomized) and he did not tell anyone until he was on trial in the instant offense." The record does not indi-

cate whom Hoover told of this traumatic event during the trial. The disclosure does not appear in any of the psychological or psychiatric reports that were prepared at the behest of the parties or the court. Indeed, the reports generally treated Hoover's anti-homosexual feelings as an irrational prejudice akin to some of his racial attitudes. Knowledge of his rape would have explained both his visceral reaction to homosexuals and the uncontrollable rage Richards was able to exploit by telling Hoover that Baldwin was a child molester.

during the killing; and (2) he had been conditioned over time by Richards to unthinkingly carry out Richards' commands. As a result, according to Dr. Rodriguez, Hoover could not appreciate the nature and quality of his act nor know it was wrong at the time of killing.

Q [Torrico]: [T]hat he was incapable of knowing the nature and quality of his act and such that he was incapable of distinguishing right from wrong at the time of the act. And—

A [Rodriguez]: Well, I think I have answered it in my last two questions . . . So the temporary psychotic quality, yes, does exist with Crossan. .

Q: Now, in the general borderline condition, where a person can have temporary psychosis, or could that temporary psychosis, be such that it could prevent a person from understanding the nature and quality of his act?

A: *Yes.*

Q: And could it be such that it would prevent that person from being incapable [sic] of knowing the difference between right and wrong?

A: *Yes.*

Q: So if I understand the answer to your question, it would be a question that in Crossy's case that he does suffer from temporary psychosis?

A: Within the framework of his borderline condition, *yes.*

(RT 2684–85.) (Emphasis added.) [6]

There was no ambiguity in these responses. Indeed, in answering yes to each of the posed questions, Dr. Rodriguez testified unequivocally that Hoover was legally insane under both prongs of the M'Naghten test. Nor was there any equivocation in the following colloquy between defense counsel and the witness:

Q: So based upon that conditioning [by Richards], would it be your answer that he did not know that he was doing was wrong?

A: Under those circumstances, *yes.*

(RT 2689.)

First, the court erroneously characterizes this testimony as Dr. Rodriguez's single assertion of unawareness of wrongfulness, and seizes on the phrase "under the circumstances" to conclude the opposite, that "[t]his was not an assertion of *incapability* of distinguishing right from wrong." (emphasis in original.) Had this answer been given in isolation or in response to a hypothetical question, the court's contradictory construction might have been reasonable. But, the answer did not stand alone. It was the condensation of a great deal of evidence, offered by Drs. Gould and French, as well as Dr. Rodriguez, regarding Richards' conditioning regime—one so extreme that the state's own witness, Dr. Joseph Gustadt, compared it to the Jonestown phenomenon. (RT 2752.)

As such, the only plausible reading of Dr. Rodriguez's terse answer is that, in his view, Hoover had been conditioned by Richards to suspend his own sense of right and wrong and to believe that whatever Richards commanded him to do was right, justified and necessary. Conversely, without that constant conditioning, Hoover would have known that his acts were wrong, as he acknowledged once Richards' overbearing influence was removed.

It follows that the state court's characterization of Dr. Rodriguez's testimony as equivocal is incorrect and in manifest con-

---

**6.** The above-quoted colloquy suggests that it was defense counsel's convoluted and inarticulate questions, rather than Dr. Rodriguez' answers, which gave the court the mistaken impression that there was equivocation on the witness' part.

flict with any fair reading of the record. Moreover, because that mischaracterization is one of the crucial anchors of its prejudice assessment, the court's finding of harmlessness is rejected as contrary to fact, as well as legally flawed.

**B. Although Hoover arguably received ineffective assistance of counsel because his attorney failed to object to the inconsistent theories and manipulation of the prosecution expert's testimony, this claim fails because Hoover cannot show actual prejudice under *Strickland.***

Hoover contends trial counsel was ineffective for failing to object to the prosecution's use of a theory inconsistent with the one used at Richards' trial and for failing to provide a proper foundation for Dr. Buehler's opinions.

### 1. Applicable Federal Law

The test for evaluating a claim of ineffective assistance of counsel is set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Williams v. Taylor,* 529 U.S. at 390, 120 S.Ct. 1495. The petitioner must show (1) that counsel's representation "fell below an objective standard of reasonableness," and (2) that counsel's performance prejudiced the defendant. *Strickland,* 466 U.S. at 688, 694, 104 S.Ct. 2052. To establish prejudice the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.,* at 694, 104 S.Ct. 2052. Where it is easier to dispose of an ineffectiveness claim on prejudice grounds that course should be followed. *Id.,* at 697, 104 S.Ct. 2052. Absent a complete denial of counsel courts "normally apply a 'strong presumption of reliability'

to judicial proceedings and require a defendant to overcome that presumption ...." *Smith v. Robbins,* 528 U.S. 259, 286, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000), *citing Strickland.* The "Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices." *Roe v. Flores–Ortega,* 528 U.S. 470, 479, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000). Review of a state court's denial of a *Strickland* claim is "doubly deferential." *Yarborough v. Gentry,* 540 U.S. 1, 6, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) (per curiam).

### 2. Application to this case

■ Defense counsel was clearly familiar with the record from Richards' trial and the previous approach taken by the prosecution. Early in his closing argument at the guilt phase counsel noted that the relationship between Richards and Hoover was an important issue. Counsel advised the jury, "In the Mark Richards trial, Mr Berberian [the prosecutor] said it is important in talking about this relationship—that it is important in explaining the relationship to understanding how he [Richards] could manipulate Crossan Hoover to commit the murder." He then quoted the prosecutor's assertion that Richards " 'was able to manipulate Crossan Hoover into the position where he actually killed a man. He was able to tell him certain things and tell it in a fashion and in a way that made Crossan Hoover believe, believe that he was capable of committing a murder and to get away with it and profit by it.' " RT 2541. Counsel emphasized, "that was the approach that Mr. Berberian took in relating the Pendragon materials and Mark Richards to Crossan Hoover in the Richards trial." RT 2542. He then went on to discuss in detail the mental health testimony about Hoover, the relationship between Richards and Hoover, and the effect, in counsel's view, of the Pendragon materials.

Defense counsel focused on the relationship between Richards and Hoover and argued that it demonstrated a lack of intent to kill. Through his argument he suggested to the jury that the prosecutor had viewed Richards as more influential in the Richards trial than he was now asserting in Hoover's trial. Because counsel's actions were objectively reasonable there was no deficient performance.

Similarly, counsel used the Pendragon material with his experts and directed questions based on the material to Dr. Buehler, the prosecution's expert. Defense counsel's failure to raise any objections did not amount to deficient performance.

## C. The State did not violate Hoover's due process rights by using inconsistent theories in the successive trials of Hoover and his co-defendant Richards

■ The cases against Hoover and Mark Richards were prosecuted by the same Deputy District Attorney, Edward Berberian. Hoover argues that the prosecutor presented factually inconsistent theories at the two trials. First, in Richards' trial he emphasized the Pendragon cult and Richards' brainwashing and manipulation of Hoover. After obtaining Richards' conviction for first degree murder, he negated the importance of the Pendragon theory in Hoover's trial, relying instead on Hoover's financial motive to convict him. Amended Petition at 35:7—40:8.

■ Under California law, claims of prosecutorial misconduct must be objected to at trial in order to be preserved upon appeal. *See People v. Fosselman,* 33 Cal.3d 572, 580–81, 189 Cal.Rptr. 855, 659 P.2d 1144 (1983). *But cf. Thomas v. Hubbard,* 273 F.3d 1164, 1176 (9th Cir. 2001), (overruled on other grounds at *Payton v. Woodford,* 299 F.3d 815 (9th Cir. 2002)) (holding that under California law

an objection to evidence in the form of a motion in limine is normally sufficient to preserve the issue for appeal even in the absence of a contemporaneous objection at trial). A petitioner who fails to observe a state's "contemporaneous objection" rules may not challenge the constitutionality of the conviction in federal court. *See Engle v. Isaac,* 456 U.S. 107, 129, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); *United States v. Frady,* 456 U.S. 152, 162–169, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982) (while plain error applies in determining whether a defendant may raise a claim for the first time on direct appeal, cause and prejudice standard applies in determining whether that same claim may be raised on habeas).

■ A petitioner is not barred and therefore does not have to show cause and prejudice, however, when a reviewing state court overlooks the procedural default and considers the claim on the merits. *See Thomas,* 273 F.3d at 1176 (holding that alleged procedural default was no bar to claim where state court addressed procedural default issue but left resolution of the issue uncertain, failing to make a clear and express statement that its decision was based on a procedural default); *Panther v. Hames,* 991 F.2d 576, 580 (9th Cir.1993); *Walker v. Endell,* 850 F.2d 470, 474 (9th Cir.1987) (relying on *Engle* to find that review on the merits for plain error by a state appellate court negates the defendant's procedural default), cert. denied, 488 U.S. 926, 109 S.Ct. 309, 102 L.Ed.2d 328 (1988).

The state court of appeal considered Hoover's appeal on this issue on the merits, removing the procedural bar.

The courts have generally agreed that the "harmless beyond a reasonable doubt" test of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) applies to due process violations. See, *In re Sakarias,* 35 Cal.4th 140, 165, 25 Cal.

Rptr.3d 265, 106 P.3d 931 (2005). Hoover argues that in light of the extensive evidence of settled mental illness presented by the defense, there can be little doubt that the prosecutor's adamant denial of the reality of Pendragon and of Richards' overbearing influence on Hoover had a substantial and injurious effect in determining the jury's verdict at both phases of the trial.

The prosecution's use of inconsistent theories was challenged on various grounds on direct appeal and in Hoover's state habeas petitions. The only reasoned decision on the issue was rendered by the California Court of Appeal, affirming Hoover's conviction. With respect to the specific argument presented herein, the court stated:

> First, no rule of misconduct or due process binds a prosecutor to a theory asserted in closing argument in a related prosecution. Broadly speaking, "The right of counsel to discuss the merits of a case, both as to the law and the facts, is very wide, and he has the right to state fully his views as to what the evidence shows, and to the conclusions to be fairly drawn therefrom. The adverse party cannot complain if the reasoning be faulty and the deductions illogical, as such matters are ultimately for the consideration of the jury." [California citations omitted.] At Hoover's trial his counsel was as free to argue a Pendragon theory as was the prosecutor to argue financial gain.

(Respondent's Exhibit 4, at 12.)

■ The court of appeal's assumption that prosecutorial misconduct is negated—rather than aggravated—by defense counsel's ineffectiveness is unsupported in law. It may be noted that in every case in which the prosecutor's use of inconsistent theories resulted in reversal, the court could have held, as the court of appeal did here, that the defense attorney was as free

to argue the original, more favorable, theory as the prosecutor was to deviate from it. But no court addressing the issue has absolved the prosecutor of his constitutional duties by shifting the burden to the defense. The duty of the prosecutor to seek justice is non-delegable. *See* ABA Model Code of Professional Responsibility, EC 7–13; *United States v. Kattar,* 840 F.2d 118, 127 (1st Cir.1988); *Cf. Kyles v. Whitley,* 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (defendant's failure to request favorable evidence does not leave the prosecutor free of obligation).

■ Prosecutorial misconduct is cognizable in federal habeas corpus. The appropriate standard of review is the narrow one of due process and not the broad exercise of supervisory power. See *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." *See id.*; *Smith v. Phillips,* 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor").

The prosecutor in his closing argument at Darden's trial for murder engaged in an intemperate diatribe in which he attempted to put some of the blame on the Florida Division of Corrections for releasing him on a weekend furlough, when he committed the murder. He also seemed to imply that only the death penalty could guarantee that a similar situation couldn't happen again. He referred to Darden as an "animal," who should only be out of his cell on a leash with a prison guard on the other end. He finally expressed the wish that Darden had fired his gun on himself or that someone else had blown Darden's head off.

The Supreme Court found that the remarks were repugnant, but held that they did not violate Darden's right of due process: " The prosecutor's argument did not manipulate or misstate the evidence, nor did it implicate other specific rights of the accused such as the right to counsel or the right to remain silent." Furthermore, "much of the objectionable content was invited by or was responsive to the opening summation of the defense." *Darden* 477 U.S. at 181–182, 106 S.Ct. 2464.

■ Factors in this case which this Court may take into account in determining whether misconduct rises to a level of due process violation are: (1) the weight of evidence of guilt, compare *United States v. Young*, 470 U.S. 1, 19, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) (finding "overwhelming" evidence of guilt) with *United States v. Schuler*, 813 F.2d 978, 982 (9th Cir.1987) (in light of prior hung jury and lack of curative instruction, new trial required after prosecutor's reference to defendant's courtroom demeanor); (2) whether the misconduct was isolated or part of an ongoing pattern, see *Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir.1987); (3) whether the misconduct relates to a critical part of the case, see *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (failure to disclose information showing potential bias of witness especially significant because government's case rested on credibility of that witness); and (4) whether a prosecutor's comment misstates or manipulates the evidence, see *Darden*, 477 U.S. at 182, 106 S.Ct. 2464.

This Court, before analyzing the factors above, must determine whether it may reach the merits of this claim within the parameters of the Anti–Terrorism and Effective Death Penalty Act ("AEDPA").

■ Respondent contends that prosecutors are not bound to follow the same theories in subsequent trials, but also argues that the court cannot even reach the merits on this petition because there is no relevant Supreme Court authority on the issue. Respondent's Answer to Amended Petition 6:10–12.[7] Where there is no Supreme Court precedent on an issue, a state court's decision on that issue cannot be "contrary to" federal law. *Brewer v. Hall,* 378 F.3d 952, 955 (9th Cir.2004). *See also Williams v. Taylor,* 529 U.S. 362, 381, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). ("If this Court has not broken sufficient legal ground to establish an asked-for constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar."). *Thompson* and other cases cited by Hoover were decided or filed prior to the enactment of AEDPA, but this case is governed by the new statute. Respondent relies on Justice Thomas' concurrence in *Bradshaw v. Stumpf,* 545 U.S. 175, 190, 125 S.Ct. 2398, 162 L.Ed.2d 143 (2005), in which he writes that the Court has "never hinted, much less held, that the Due Process Clause prevents a State from prosecuting defendants based on inconsistent theories." *Id.*

Stumpf pled guilty to aggravated murder in a robbery that left one victim wounded and another victim dead, but never admitted killing him. In his habeas appeal, he argued that in his death penalty hearing the State claimed that he was the principal actor in the crime because he had shot a victim who died, yet in the trial of his co-defendant, the State flip-flopped and pinned the fatal shooting on Stumpf's co-defendant. *Id.* The Court remanded for a determination of whether the prosecution's

---

**7.** Hoover's causes of action accrued when the California Supreme Court denied review February 25, 1987.

use of inconsistent theories could be the basis of relief, without necessarily finding that it could constitute a due process violation. The majority of the Supreme Court declined to address the issue of prosecutorial inconsistency because it was irrelevant to whether the petitioner's confession was knowing, voluntary, and intelligent, and the precise identity of the gunman was immaterial to an aggravated murder conviction. The majority upheld the plea but remanded on the sentencing claim:

> The prosecutor's use of allegedly inconsistent theories may have a more direct effect on Stumpf's sentence, however, for it is at least arguable that the sentencing panel's conclusion about Stumpf's principal role in the offense was material to its sentencing determination. The opinion below leaves some ambiguity as to the overlap between how the lower court resolved Stumpf's due process challenge to his conviction and how it resolved Stumpf's challenge to his sentence. It is not clear whether the court of appeals would have concluded that Stumpf was entitled to re-sentencing had the court not also considered the conviction invalid ... In these circumstances, it would be premature for this Court to resolve the merit's of Stumpf's sentencing claim, and we therefore express no opinion on whether the prosecutor's actions amounted to a due process violation, or whether any such violation would have been prejudicial.

*Id.* at 187–188, 125 S.Ct. 2398.

Respondent contends that even if the decision in *Stumpf* had clearly established a rule that inconsistent theories violate due process, it did not do so until June 2005, long after Hoover's case became final when review was denied in 1987. " '[C]learly established federal law' " under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision. *Lockyer v. Andrade,* 538 U.S. 63 at 71–72, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). In 1987 reasonable jurists could disagree as to whether there was such a rule, demonstrating that it was not clearly established. *Schardt v. Payne,* 414 F.3d 1025, 1037 (9th Cir.2005) ("If a case creates a new rule under *Teague v. Lane,* 489 U.S. 288, 310, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) , then it is not a clearly established rule under 28 U.S.C. § 2254(d)(1)"); *see Kane v. Garcia Espitia,* 546 U.S. 9,10, 126 S.Ct. 407, 163 L.Ed.2d 10 (2005).

Hoover responds that the Court in *Stumpf* was not reserving the prosecutorial misconduct issue for future resolution but, due to the lack of clarity of the Sixth Circuit's reasons for vacating Stumpf's sentence, remanding for a determination whether the prosecutor's actions amounted to a prejudicial due process violation at sentencing. *Stumpf,* 545 U.S. at 188, 125 S.Ct. 2398. Hoover argues that the Court was not articulating a possible new rule of law regarding prosecutorial misconduct but merely applying a rule that already existed: that due process constraints on prosecutorial behavior are clear, and no multi-pronged factor tests are required. The lack of a Supreme Court case expressly addressing a prosecutor's use of inconsistent and misleading arguments does not bar habeas relief.

Furthermore, habeas relief is available where the state court of appeal fact-finding is unreasonable by clear and convincing evidence. A "determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). The "presumption of correctness is equally applicable when a state appellate court, as opposed to a state trial court, makes the

finding of fact." *Sumner v. Mata,* 455 U.S. 591, 592–593, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982); *Norton v. Spencer,* 351 F.3d 1, 6 (1st Cir.2003).

Clear and convincing evidence produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is "highly probable." *Colorado v. New Mexico,* 467 U.S. 310, 316, 104 S.Ct. 2433, 81 L.Ed.2d 247 (1984). Only after a petitioner successfully rebuts the presumption of correctness by clear and convincing evidence may the court determine if the resulting decision was based on an unreasonable determination of the facts. *Miller–El v. Cockrell,* 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). Therefore, it is theoretically possible that a state court finding is incorrect but not unreasonable.

▮ No rule of misconduct or due process yet binds a prosecutor to a theory asserted in closing argument in a related prosecution. Broadly speaking, "The right of counsel to discuss the merits of a case, both as to the law and facts, is very wide, and he has the right to state fully his views as to what the evidence shows, and as to the conclusions to be fairly drawn therefrom. The adverse party cannot complain if the reasoning be faulty and the deductions illogical, as such matters are ultimately for the consideration of the jury." (*People v. Beivelman* (1968) 70 Cal.2d 60, 76–77, 73 Cal.Rptr. 521, 447 P.2d 913, overruled on other grounds in *People v. Green* (1980) 27 Cal.3d 1, 33–34, 164 Cal. Rptr. 1, 609 P.2d 468, quoting *People v. Eggers* (1947) 30 Cal.2d 676, 693, 185 P.2d 1, and *People v. Sieber* (1927) 201 Cal. 341, 355–356, 257 P. 64). At Hoover's trial his counsel was as free to argue a Pendragon theory as was the prosecutor to argue the financial gain theory. Whether this should remain the rule is not for this Court to decide.

Furthermore, the Mark Richards judgment could not have had the claimed collateral estoppel effect or have established that Hoover was insane as a matter of law, because Hoover's motive and sanity were not issues that were "necessarily decided" at Richards' trial. (*People v. Taylor* (1974) 12 Cal.3d 686, 691, 117 Cal.Rptr. 70, 527 P.2d 622) Hoover concedes his insanity was not necessarily decided, but argues "it may be implied that an issue 'necessarily decided' at the Richards trial was that he was found guilty of murder on the People's theory that he manipulated Crossan Hoover into committing the crime by brainwashing him to believe he was doing it for Pendragon." It is impossible to know, however, the theory upon which the Richards jury reached its verdict.

The prosecutor's theories at Richards' and Hoover's trials varied, but they were not necessarily inconsistent. At Richards' trial the prosecutor's theory was that due to the relationship between Richards and Hoover in the course of the Pendragon conspiracy. Richards "was able to manipulate Crossan Hoover into the position where he actually killed a man." At Hoover's trial the prosecutor conceded, consistently, that "Mr. Richards manipulated Crossan Hoover," but added that "there is a far difference between manipulation and *control* in the sense that what the defense is trying to argue and urge upon you...." (Emphasis added.) "Even assuming that fundamental notions of fairness and due process should preclude a prosecutor from asserting diametrically opposed theories in related prosecutions, nothing of the sort occurred here." Exhibit 4 at 10–12, footnote numbering in original; *People v. Hoover,* 187 Cal.App.3d at 1082–1083, 231 Cal. Rptr. 203.

While the Supreme Court has yet to consider this issue, other federal courts have reached it but there "is no clear

consensus ... on whether a prosecutor may be precluded from raising an argument at a criminal trial because the government has asserted a factually incompatible argument in pursuing a conviction against another defendant at another trial." *United States v. Urso,* 369 F.Supp.2d 254, 263 (E.D.N.Y.2005). Courts have applied a judicial estoppel theory to bar prosecutors from arguing different theories of liability "only where there is a clear and categorical repugnance" between the two theories. *Id.* at 264. The Ninth Circuit has concluded that the use of inconsistent theories against separate defendants charged with the same crime could result in a due process violation if the prosecutor knowingly used false evidence or acted in bad faith. *Nguyen v. Lindsey,* 232 F.3d 1236, 1240 (9th Cir.2000). It is, however, neither "shocking nor even unusual" that evidence may come in "somewhat differently at each trial." *Id.* The Court must then look to the arguments in light of the evidence in each trial. *See Shaw v. Terhune,* 380 F.3d 473, 479 (9th Cir.2004) (no prejudicial error where each prosecutor in separate trials of co-defendants argued a "plausible theory for the interpretation of ambiguous evidence").

The California Supreme Court has held that "fundamental fairness does not permit the People, without a good faith justification, to attribute to two defendants, in separate trials, a criminal act only one defendant could have committed." *In re Sakarias,* 35 Cal.4th at 155–156, 25 Cal. Rptr.3d 265, 106 P.3d 931. The court was particularly concerned with the "deliberate manipulation of the evidence" presented in the trials, noting that "only the defendant against whom the false theory was used can show constitutionally significant preju-

dice." *Id.* at 156, 25 Cal.Rptr.3d 265, 106 P.3d 931. The issue, as in the federal cases, is whether the prosecutor used "inconsistent and irreconcilable theories" "without a good faith justification for the inconsistency" to convict the defendants. *Id.* at 159–160, 25 Cal.Rptr.3d 265, 106 P.3d 931. A comparison of the prosecution theory in Richards' and Hoover's trials demonstrates that they were arguably neither inconsistent nor irreconcilable.

As noted in the state appellate court opinion, Hoover's claim revolves around the extent to which the so-called Pendragon conspiracy was utilized by the prosecutor in the two trials. In Richards' case the prosecutor advised the jury in his opening statement that the Pendragon evidence was being offered to show that Hoover, among others, believed what Richards told them about the plot and demonstrated Richards' "ability to weave this fantasy of his into something that these people put some credence in ...." The evidence would show that Richards used the Pendragon plan "to manipulate and condition [Hoover] to do and act as he wanted him in regard to the murder." Exhibit 10 at 578–579.[8]

In his opening summation the prosecutor asserted that Richards was guilty of first degree murder as an aider and abettor. While not wielding the murder weapon, Richards "for all intents and purposes, put that weapon in the hands of [Hoover]." Exhibit 11 at 2455.[9] The prosecutor added that the Pendragon material had been offered for the "limited purpose" of allowing the jury to "understand the relationship of Mr. Richards to these young men that he associated himself with." He argued that Hoover "believed sufficiently in Mark

---

8. Exhibit 10 to Respondent's Answer To Amended Petition contains the prosecutor's opening statement from the Richards trial.

9. Exhibit 11 to Respondent's Answer To Amended Petition contains the closing arguments of both sides from Richards' trial.

Richards that he could kill someone. He could kill someone, and he could profit from that killing, and he could justify it." Exhibit 11 at 2550–2551.

The prosecutor returned to these themes in closing argument. Noting that Richards was going to pay Hoover $5,000 for the killing, Exh. 11 at 2761, the prosecutor argued that Richards was "able to manipulate [Hoover] into the position where he actually killed a man.[¶] He was able to tell him certain things and events, and tell it in a fashion and in a way that made [Hoover] believe that he was capable of committing a murder, and to get away with it, and profit by it." Exhibit 11 at 2832. Denying, contrary to defense counsel's argument, that the Pendragon conspiracy was "the centerpiece" of the state's case, Exhibit 11 at 2837, the prosecutor said that it demonstrated that Richards was conditioning Hoover and the others to believe what he told him. "And would it be unreasonable for [Hoover] at that point, being exposed to this type of material, to think that this man [Richards] could go ahead and plan a murder of his friend, plan a murder of his friend, and go ahead and accomplish that?" Exhibit 11 to Answer to Amended Petition at 2893.

In affirming Richards' conviction the state court of appeal held that the Pendragon evidence was properly admitted "to show that [Richards] had the ability to and did persuade [Hoover] to kill Baldwin. . . . It showed that [Richards] intended to use people as instruments of his own designs, and that therefore [Hoover] killed Baldwin at [Richards'] command." The record established that Richards was able to "convince [Hoover] to believe that killing Baldwin would help [Hoover] solve his financial problems and that [Hoover] could benefit financially as well." Exhibit 12 to Answer to Amended Petition at 4–5.

The prosecutor demonstrated at Richards' trial that Richards was able to convince Hoover to believe him and thus manipulate Hoover into committing the murder. The prosecutor did not argue that Hoover lacked his own motive for agreeing to assist Richards.

During his opening argument in Hoover's case the prosecutor asserted that Hoover killed Baldwin because "he wanted money." RT 2508.[10] He acknowledged that Richards "manipulated" Hoover but insisted that "there is a far difference between manipulation and control in the sense that ... there was no independent thought process basically by [Hoover] in this transaction." The prosecutor denied that the evidence demonstrated Hoover was "an automaton" or "mindless person walking from one point to another, controlled and manipulated so that he did not have the intent to kill; that he did not have the intent to steal; that he did not premeditate or deliberate." RT 2523–2524. Rather, Hoover "knew what he was doing. He intended to kill Mr. Baldwin." RT 2528.

Defense counsel noted that in Richards' trial the prosecutor had discussed the extent to which the Pendragon materials established how Richards could manipulate Hoover to commit the murder. RT 2541–2542. Counsel asserted that Richards dominated Hoover. RT 2556. In response the prosecutor insisted during closing argument that Hoover knew what Richards was planning. "No, he [Hoover] didn't plan it. We're not saying he did. We have never maintained that he did. But he was a part of the plan. He was a willing participant in the plan. He wanted

10. RT designates the reporter's transcript from Hoover's trial which was lodged by respondent as Exhibit 9 to Answer To Amended Petition. The prosecutor's opening statement was not transcribed.

money for whatever use he was going to make of it. He wanted money." RT 2609–2610. Respondent contends that Hoover knew what he was supposed to do and bore responsibility for his participation in the murder. RT 2615. The prosecutor emphasized testimony from a mental health expert that just before the killing Hoover thought about the money he would receive. RT 2629.

Comparison of the prosecution arguments in the two trials demonstrates substantial differences but arguably no fundamental or irreconcilable contradictions in the state's case. There was no doubt in either trial that Hoover was the actual killer or that Richards planned the attack and convinced Hoover to assist him. There was, however, a significant evidentiary difference with respect to Hoover's mental state. While no such evidence was admitted in Richards' trial, it was the centerpiece of Hoover's defense. His jury could thus decide just how much influence Richards had in light of his mental problems, and whether Hoover acted solely at Richards' direction or for his own purposes. Even assuming some inconsistency in the prosecutor's arguments, such differences did not necessarily have a substantial and injurious effect on the verdict. *Shaw v. Terhune,* 380 F.3d at 480 (rejecting claim based on inconsistent prosecution theories).

The case law, moreover, clearly distinguishes between theories which are merely inconsistent, and those which are irreconcilable, and therefore violate due process because they cast doubt on the integrity of the conviction and sentencing of a defendant. The *Sakarias* case clearly supports the Respondent's opposition to charges of prosecutorial misconduct for propounding inconsistent theories in the trial of Richards and Hoover.

As the court in *Sakarias* stated:"

"On the other hand, we can find no due process or Eighth Amendment violations in Ipsen's [the prosecutor's] allegedly inconsistent arguments regarding domination. Though Ipsen's emphasis in each trial was different, his basic factual position, which was largely based on the same evidence in the two cases, was consistent: neither defendant could claim mitigation because of his "substantial domination." (Pen.Code § 190.3, factor (g)) by the other. See *State v. Lavalais* (La.1996) 685 So.2d 1048, 1056–57 [no due process violation where prosecutor argued in successive trials that Lavalais was and was not under the domination and control of coperpetrator: the fundamental facts the prosecutor presented did not vary, and the appearance of inconsistency merely reflected the fact that "the state's emphasis as to culpability was different in the two trials"]. Semantically, Ipsen's argument in Waidla's trial that Waidla was "the dominate [*sic*] person between himself and Mr. Sakarias" may have been inconsistent with his argument in Sakarias's trial that there was "no evidence of domination." Conceptually, however, it was not contradictory for Ipsen to point out in Waidla's case that he had the greater motivation (because the Piirisilds [the victims] assertedly owed him money or a car) and greater knowledge of the house (and thus might have taken the lead role in planning the burglary), while observing in Sakarias's case that the evidence showed Sakarias had taken his friend's grievance as his own and participated cooperatively in the crimes."

*In re Sakarias* (2005) 35 Cal.4th 140, 161, fn. 4, 25 Cal.Rptr.3d 265, 106 P.3d 931.

Co-defendants Sakarias and Waidla ambushed and murdered in her home the wife of a couple who had befriended them but had not given them what they believed they were owed, including money and a

car. The California Supreme Court sustained the primary allegation of a due process violation due to inconsistent prosecutorial theories at the separate trials of the co-defendants. Specifically, the prosecutor manipulated the evidence to support his contention that each defendant, in a different room, delivered the fatal hatchet blow that ended the victim's life. The court found these theories to be both inconsistent and irreconcilable.

However, the court found no due process violation in the prosecutor's alternate theories of "domination" and "no domination" in the two defendants' separate trials. *Sakarias* is an extremely detailed and thoughtful decision, following an evidentiary hearing in which the prosecutor testified as to his intentions in introducing or not introducing various pieces of evidence which would tend to prove or disprove each of his discordant theories. Justice Werdegar wrote a thorough and scholarly decision. Applying it to the facts in this case, this Court could not reasonably find a due process violation in the prosecutor's use of theories of manipulation and independent motive in the trials of Richards and Hoover.

**D. The State did violate Hoover's due process rights by withholding evidence from its expert witness to manipulate the expert's testimony.**

▆▆▆ Following Hoover's plea of not guilty by reason of insanity, the state trial court appointed two mental health experts to examine Hoover and report their findings. Neither expert found that Hoover was insane when he committed the murder.[11] The prosecutor called only one of the experts, Dr. John Buehler, to testify on rebuttal in the guilt phase and as a witness in the sanity phase. Hoover alleges that the prosecutor committed misconduct by failing to provide the expert with materials about the Pendragon conspiracy. The claim was rejected by the California Supreme Court on habeas corpus, but without analysis. Consequently this Court's review is de novo.

Hoover argues that the State violated his due process rights by withholding evidence about the Pendragon cult from Dr. John Buehler, a state-appointed psychiatrist who examined Hoover and testified that his only motive in the killing was financial. Amended Petition at 51–54. Essentially, because Dr. Buehler's testimony was based on incomplete information, it was false. Amended Petition at 56:10–12.

Hoover notes that although this claim was raised in his successive state habeas petitions, no reasoned decision on the merits was issued by any California court. Furthermore, no state procedural bar was unequivocally asserted with respect to the claim.

The state trial court stated two grounds for denying the petition: (1) that Hoover improperly sought a review of the trial proceedings; and (2) with respect to the claim of ineffective assistance only, that the allegations in the petition were insufficient to sustain the complaint. (Respondent's Exhibit 10 to Answer To Amended Petition)

Neither rationale applies to the claim of prosecutorial misconduct. The court of appeal's denial was summary. (Respondent's Exhibit 12)

Of the various procedural grounds listed in the state Supreme Court's order, none except the *Clark–Robbins* timeliness bar could logically be applicable to this claim. However, this is merely an inference, with no express guidance from the state Su-

---

**11.** The reports of the experts are at Exhibits 13 and 14 of Respondent's Answer To Amended Petition

preme Court. (Respondent's Exhibit 14 to Answer To Amended Petition)

Therefore, while this Court does not write on a completely blank slate in this matter, the ordinary rules of deference have no straightforward application to the state's summary denials of Hoover's prosecutorial misconduct claim. Accordingly, the Court may conduct an independent review of the record to determine whether the state courts' denial of Hoover's claim was objectively reasonable. *See Delgado v. Lewis,* 223 F.3d 976, 982 (9th Cir.2000).

This Court concludes that under any applicable standard, the prosecutor's withholding of materially favorable information from Dr. Buehler and consequent manipulation of the evidence violated long-standing federal precedents from *Napue* forward. Because there is a reasonable likelihood that but for the prosecutor's manipulation of Dr. Buehler's opinion, Hoover would not have been found not guilty by reason of insanity of first degree or even second degree murder, his conviction must be set aside.

Respondent argues that nothing done by the prosecutor denied Hoover a fundamentally fair trial, and no information was purposefully withheld from the witness. Ans. 13:12–15. Hoover did not raise this issue on direct appeal but did present it in his state habeas petition. The California Supreme Court denied relief. (Ex. 8 to Answer to Amended Petition). The state court order cited five California Supreme Court decisions, all of which relate to state procedural defaults, and it is arguable that the court did not reach the merits of this claim. Based on Ninth Circuit precedent Respondent has not argued that the claim is procedurally defaulted. In such cases the deference standard of § 2254(d) does not apply and the federal habeas court conducts a de novo review. *Pirtle v. Morgan,* 313 F.3d 1160, 1167 (9th Cir.2002);

*Menendez v. Terhune,* 422 F.3d 1012, 1026 (9th Cir.2005).

### a. Violation of Due Process

■ A federal court considering claims of prosecutorial misconduct in state criminal proceedings is limited to determining solely whether the defendant was denied due process. *Donnelly v. DeChristoforo,* 416 U.S. 637, 642, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). A finding of misconduct is not alone sufficient to justify a new trial, since the "touchstone of due process" in such cases "is in the fairness of the trial ...." *Smith v. Phillips,* 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). If the trial was fundamentally fair there is no constitutional violation, regardless of whether the prosecutor erred. *Darden v. Wainwright,* 477 U.S. at 183–184 n. 15; *Tak Sun Tan v. Runnels,* 413 F.3d 1101, 1112 (9th Cir.2005).

### b. Reasonable likelihood of affecting jury's judgment

■ The *Brecht* standard is inapplicable to habeas claims involving violation of a prosecutor's duty not to present or to fail to correct false evidence under *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). *Hayes v. Brown,* 399 F.3d 972, 984 (9th Cir.2005);*Brecht v. Abrahamson,* 507 U.S. 619, 629–30, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). In such a case, the standard on habeas review is whether there is "any reasonable likelihood" that the false evidence could have affected the jury's judgment under the standard set forth in *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). *Id.* The *Brecht* standard applies retroactively. *See, e.g., McKinney v. Rees,* 993 F.2d 1378, 1385 (9th Cir.1993) (applying *Brecht* to pre-

*Brecht* final judgment), *cert. denied,* 510 U.S. 1020, 114 S.Ct. 622, 126 L.Ed.2d 586 (1993).

Napue holds that the knowing use of false evidence by the state, or the failure to correct false evidence, violates due process. 360 U.S. at 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217. To prevail on a Napue claim, the petitioner must show that "(1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) . . . the false testimony was material." *Hayes v. Brown,* 399 F.3d 972, 984 (9th Cir.2005) (en banc) (omission in original) (internal quotation marks omitted). For the purpose of Napue claims, materiality is determined by whether "there is 'any reasonable likelihood that the false testimony could have affected the judgment of the jury,'" in which case the conviction must be set aside. *Belmontes,* 414 F.3d at 1115 (quoting United States v. Agurs, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)). "Under this materiality standard, [t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Hayes,* 399 F.3d at 984 (alteration in original) (internal quotation marks omitted).

*Hovey v. Ayers* 458 F.3d 892, 916 (9th Cir.2006)

 The proper question in assessing harm in a habeas case is, "'Do I, the judge, think that the error substantially influenced the jury's decision?'" *O'Neal v. McAninch,* 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995). If the court is convinced that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand. *Id.* at 437, 115 S.Ct. 992. If, on the other hand, the court is not fairly assured that there was no effect on the verdict, it must reverse. *Id.* In the "narrow circumstance" in which the court is in "grave doubt" about whether the error had substantial and injurious effect or influence in determining the jury's verdict, it must assume that the error is not harmless and the petitioner must win. *Id.* at 436, 438, 115 S.Ct. 992; *see, e.g., id.* at 436–44, 115 S.Ct. 992 (relief granted because record so evenly balanced that conscientious judge in grave doubt as to harmlessness of error); *Alvarez v. Gomez,* 185 F.3d 995, 998–99 (9th Cir.1999) (writ must be granted where recorded confessions were wrongly admitted and without them the facts of the case are in equipoise as to whether there is sufficient evidence to support the conviction).[12]

 A federal habeas court reviewing the prejudicial effect of constitutional error at trial does not simply examine whether there was sufficient evidence to support the conviction in the absence of constitutional error. Rather, regardless of whether there is sufficient evidence to support the conviction apart from the error, the court must determine whether the error had a substantial and injurious effect or influence on the conviction. If it did, the court must set aside the conviction. *Ghent v. Woodford,* 279 F.3d 1121, 1127 (9th Cir.2002) (finding prejudice under *Brecht* from admission of evidence obtained in violation of *Miranda* after examining effect of erroneously admitted evidence only on disputed issue of petitioner's

12. The "grave doubt" standard does not apply to the court's finding of facts to determine whether a constitutional error has in fact occurred; at the fact-finding stage, when the scales are evenly balanced, the party with the burden of proof (the petitioner) loses. *Simmons v. Blodgett,* 110 F.3d 39, 41–42 (9th Cir.1997).

mental state, not on undisputed question of whether petitioner actually committed crimes). This does not mean, however, that the court cannot review all the state's evidence to determine whether the error had a substantial and injurious effect on the jury's verdict. *Sims v. Brown,* 425 F.3d 560, 570–71 (9th Cir.2005), *amended,* 430 F.3d 1220 (9th Cir.2005).

■■■ A trial error is considered harmless under *Brecht* only if the *actual* jury in the case would have reached the same verdict absent the error. *Gray v. Klauser,* 282 F.3d 633, 654–55 (9th Cir.2002), *judgment vacated on other grounds,* 537 U.S. 1041, 123 S.Ct. 658, 154 L.Ed.2d 512 (2002) (emphasis in original). Therefore, a court must not go beyond the record in deciding the likely effect if the error had not occurred. *Id.* at 655, 282 F.3d 633.

■■■ The length of jury deliberations may be examined when assessing harmlessness. "'Longer jury deliberations weigh against a finding of harmless error because lengthy deliberations suggest a difficult case.'" *United States v. Lopez,* 469 F.3d 1241, 1246 (9th Cir.2006) (rev'd on other grounds at 500 F.3d 840 (9th Cir.2007)) (quoting *United States v. Velarde–Gomez,* 269 F.3d 1023, 1036 (9th Cir. 2001)); *see, e.g., Lopez,* 469 F.3d at 1246 (jury's deliberation for 2–1/2 hours on illegal reentry case suggested any error in allowing testimony or commentary on defendant's post-*Miranda* silence was harmless); *Velarde–Gomez,* 269 F.3d at 1036 (jury deliberation for 4 days supported inference that impermissible evidence affected deliberations).

The jury in the Hoover case deliberated longer over sanity than they did over guilt. They were obviously either divided or uncertain about their decision.

### c. Relevance of evidence in Richards trial to Hoover trial

The prosecutor's revision of his theory from Richards' trial to Hoover's had an evidentiary corollary, most apparent in the preparation, rather— lack of preparation of Dr. Buehler. The prosecutor withheld from Dr. Buehler, its main psychiatric expert, critical information regarding the "reality" of the Pendragon plot and its insidious impact on the minds of the young men, especially Hoover, who were under Richards's destructive influence. It was incumbent on the prosecution to provide his expert at least some of the exhibits and testimony he had used at Richards's trial to argue that:

> The relevance of the information [Pendragon] is what was being told these boys?
> Were they being conditioned in a fashion that they believed this man could do something as preposterous as what we have talked about, and accomplish it? And would it be unreasonable for Mr. Hoover at that point, being exposed to this type of material, to think that this man could go ahead and plan a murder of his friend, plan a murder of his friend, and go ahead and accomplish that?
> That is the relevance of the material, and it is very, very clear when it shows what he [Richards] can say and what he can do, *and how he can weave what he wants others to think and believe.*

(Pet.Suppl.Ex. K, 2893) (emphasis added)

By withholding important background information, the prosecutor was able to use Dr. Buehler's expert testimony quite effectively to accomplish—and obscure—his deliberate manipulation of the evidence at Hoover's trial. Here as in *Sakarias,* the record establishes that the prosecution's use of divergent factual theories was intentional, unjustified and in violation of Hoover's rights to due process and a fair,

reliable adjudication of his guilt and punishment.

The switch in theories was manifestly prejudicial. At the least a different verdict, of not guilty by reason of insanity, if not full acquittal, would have resulted, had the jury heard directly from the prosecutor, or through his proxy, Dr. Buehler, that: "The young men in this case that are involved with Mr. Richards, Mr. Hoover in particular, and Mr. Campbell, are people that he was able to manipulate either emotionally or psychologically, however you want to call it. He was able to manipulate them into a position where they would help him commit crime. These young kids are kids that are basically emotionally damaged. It is Mr. Richards's ability to manipulate, to control the behavior of these young boys that is central to our theory that he was an aider and abettor, and an enticer in the commission of this act, because we cannot bring in the evidence to show that he wielded the death weapon. He didn't. Mr. Hoover did. But he put the weapon in his [Hoover's] hand."

### d. Duty of prosecutor

■ The Supreme Court has long emphasized "the special role played by the American prosecutor in the search for truth in criminal trials." *Strickler v. Greene,* 527 U.S. 263, 281, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). As the Ninth Circuit observed in *Commonwealth of Northern Mariana v. Mendiola,* 976 F.2d 475, 486 (9th Cir.1992) (*en banc*) (citations omitted), overruled on other grounds by *George v. Camacho,* 119 F.3d 1393 (9th Cir.1997): "The prosecuting attorney represents a sovereign whose obligation is to govern impartially and whose interest in a particular case is not necessarily to win, but to do justice . . . . It is the sworn duty of the prosecutor to assure that the defendant has a fair and impartial trial."

■ One of the bedrock constitutional principles of public prosecution, "implicit in any concept of ordered liberty," is that the state may not use false evidence to obtain criminal conviction. *Hayes v. Brown,* 399 F.3d 972, 978 (9th Cir.2005) (*en banc*), citing *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). Thus "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Id.,* citing *Napue,* 360 U.S. at 269, 79 S.Ct. 1173. "Indeed, if it is established that the government permitted the introduction of false testimony reversal is 'virtually automatic.'" *United States v. Wallach,* 935 F.2d 445, 456 (2nd Cir.1991).

■ In addition, the state violates a criminal defendant's right to due process of law when, although not soliciting false evidence, it allows false evidence to go uncorrected when it appears. *Alcorta v. Texas,* 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957); *Pyle v. Kansas,* 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942).

Most recently, in *Hayes v. Brown,* the Ninth Circuit held that the state had committed a *Napue* violation where the prosecutor made an agreement with the attorney for a cooperating witness (in which the prosecutor promised to dismiss pending felony charges against the cooperator) that the witness be kept in the dark about the promise, so that he could testify that there was no such deal without perjuring himself. 399 F.3d at 979.

Trial went according to the prosecutor's plan: the witness testified that he knew of no deals or promises that had been made regarding his pending charges and in its closing, the prosecutor emphasized the truthfulness of the state's witnesses.

■ The state argued that there was no *Napue* violation because the wit-

ness did not commit perjury. In rejecting this argument, the court emphasized that, by its terms, *Napue* addresses the presentation of false testimony, not just subornation of perjury. *Id.* at 980. Due process protects defendants against the knowing use of any false evidence by the state, whether by document, testimony or any other form of admissible evidence. *Id.* A prosecutor cannot seek refuge in the claim that a witness did not commit perjury, "when the witness unknowingly presents false testimony at the behest of the State. This saves the witness from perjury, but it does not make his testimony truthful." *Willhoite v. Vasquez*, 921 F.2d 247, 251 (9th Cir.1990) (Trott, J., concurring). "The fact that the witness is not complicit in the falsehood is what gives the false testimony the ring of truth, and makes it all the more likely to affect the judgment of the jury. That the witness is unaware of the falsehood of his testimony makes it more dangerous, not less so." *Hayes*, 399 F.3d at 981.

Having determined that a *Napue* violation had occurred, the court in *Hayes* assessed whether the constitutional violation was material. *Id.*, at 984, citing *United States v. Zuno–Arce*, 339 F.3d 886, 889 (9th Cir.2003). The standard of materiality in this context is whether "there is any reasonable likelihood that the false testimony could have affected the judgment of guilty"; if so, then "the conviction must be set aside." *Belmontes v. Woodford*, 350 F.3d 861, 881 (9th Cir.2003), quoting *Agurs*, 427 U.S. at 103, 96 S.Ct. 2392.

Because the cooperating witness was, by any measure, a key witness, the court held that the petitioner had satisfied the *Napue/Alcorta/Agurs* materiality test and that the due process violations undermined confidence in the verdict. Moreover, "that the false evidence ... dealt only with credibility does not change the materiality calculus," for, "the jury's estimate of the reli-

ability of a given witness may well be determinative of guilt or innocence." *Hayes*, 399 F.3d at 986, citing *Napue*, 360 U.S. at 269, 79 S.Ct. 1173.

### e. Psychiatrist was a key witness

There can be no question that a key—if not the key—witness at the guilt phase and the abbreviated sanity phase of Hoover's trial—was John Buehler, M.D., who testified for the prosecution as an expert in psychiatry and clinical psychology. (RT 2410 *et seq.*). The only serious defense mounted at the guilt phase was a diluted version of the insanity claim. Defense counsel argued that as a result of a mental disorder—intensified by voluntary intoxication and exploited by Richards' manipulation—Hoover did not have the ability—nor did he actually—form the mental states, intent and malice, that are essential elements of murder. A number of diverse mental health professionals testified in support of Hoover's defense. A school psychologist and a youth counselor who examined Hoover in 1981 described him as pre-psychotic. (RT 2090–2099.) A mental health counselor at juvenile hall, who examined Hoover in mid-July 1982, shortly after Hoover was arrested, testified to an array of severe psychiatric symptoms during that period, including hallucinations and paranoid delusions. (RT 2190–2202.)

Dr. Jonathan French, a clinical psychologist, and Drs. Roman Rodriguez and Brian Gould, both psychiatrists, diagnosed Hoover with borderline personality disorder, but emphasized different aspects of his mental illness. Dr. French, who administered a battery of psychological tests to Hoover, observed Hoover's decompensation, agitation and disorganized thinking in the course of the evaluation. (RT 1771–73.) Dr. French also touched upon Richards' exploitation of Hoover's emotional instability through the Pendragon fantasy

and specific appeals to Hoover's hatred of child molesters. (RT 1822.)

Dr. Gould, a psychiatrist, also licensed in psychopharmacology and neurology, stressed Hoover's extreme subordination to Richards to the point that Hoover had significantly lost his independence and autonomous psychological existence by the time of the killing. (RT 1911.)

Finally, Dr. Roman Rodriguez, a child psychiatrist, testified about the array of intrinsic and external emotional factors affecting Hoover on the date of the killing, concluding that there was a high probability that Hoover was transiently psychotic at the time. (RT 2266.)

Drs. French and Rodriguez interviewed Hoover in September, 1982, while he was still at the juvenile facility.

In rebuttal, the prosecution called Dr. Buehler, also a practicing psychiatrist, who had been appointed by the court after Hoover had been transferred to the county jail. Dr. Buehler interviewed Hoover once in December, 1982 and again in January, 1983, for a total of approximately one and one-half hours. (RT 2419.) Because the referral had come from the court, not the parties, both the prosecutor and defense counsel provided him with background materials. The prosecution provided him with prior psychiatric reports and other mental status evaluations prepared in 1981 and 1982, including the reports of Drs. French and Rodriguez. (RT 2417–18.) In addition, the defense provided transcripts of police interviews with Hoover and Campbell and of the preliminary hearing, as well as school, hospital and probation reports. (RT 2415–16.)

In his report, Dr. Buehler described Hoover as "polite, reserved, cooperative and somewhat depressed. Hoover was oriented to time, place and person... manifested no hallucinations or delusions, and engaged in thought processes that were within normal limits." (Pet.Suppl.Ex. I, 148—149.)

Dr. Buehler was dismissive of the materials provided by the attorneys because, in his view, little of it was relevant to the question posed: whether Hoover was not guilty by reason of insanity. His own opinion was that Hoover did not meet the criteria for legal insanity. This was based on his conclusion that Hoover did not suffer from any mental disease or defect, but rather, from an undersocialized aggressive type of conduct disorder. While acknowledging that Hoover, at the time of the murder, was psychologically stressed by his separation from his mother and under the influence of Mark Richards, Dr. Buehler concluded that Hoover's primary motivation for the crime was financial. (RT 2437.)

To prepare for his rebuttal, Dr. Buehler attended court during Dr. Rodriguez's testimony. Therefore, during his direct examination of Dr. Buehler, the prosecutor was able to elicit a point-by-point critique of Dr. Rodriguez's opinions.

It is clear from his report—and later testimony—that Dr. Buehler's conclusions depended to a significant degree on Hoover's responses and demeanor during the two interviews. Aside from the scant information that he received from the other evaluations and Hoover's brief statements, Dr. Buehler had no conception of the impact that the Pendragon fantasy had on the boys who participated, especially Hoover. He was provided with none of the evidence that had figured so prominently in Richards' trial.

In his cross-examination of Dr. Buehler, defense counsel posed a lengthy series of hypotheticals detailing Richards' representations and actions in furtherance of the Pendragon plot. At the end Dr. Buehler conceded that if he were convinced that Richards really believed in and was work-

ing at the Pendragon plot, he might change his mind regarding Richards "pernicious" influence on Hoover. (RT 2476–82.)

Evidence supporting details of the hypotheticals had been adduced during Richards' trial, and to a much lesser degree, at Hoover's trial. Yet, neither the prosecutor nor the defense provided this evidence to Dr. Buehler.

Dr. Buehler was critical of Dr. Rodriguez's conclusion that Hoover was experiencing auditory and visual hallucinations during Baldwin's killing. (RT 2428.) Specifically, Hoover had recounted to him that Baldwin was rising up and talking to him after he had been hit with the bat three times and that Hoover then hit him again with the bat and then stabbed Baldwin repeatedly in the eye socket and "scrambled his brains". (RT 2265.)

Evidently, neither the prosecutor nor the defense provided Dr. Buehler with the autopsy report which irrefutably contradicted Hoover's perceptions. The prosecutor in fact elicited Dr. Buehler's uninformed testimony that Hoover's description could well have been accurate, when the prosecutor knew that it had to be hallucinatory.

Finally, as noted above, Dr. Buehler relied to a significant degree on Hoover's apparent calmness and clearness of thought during the two interviews. He emphasized Hoover's ability to conform his conduct to the "orderly life in jail," and his ability to cooperate. These conclusions were in marked contrast to Hoover's emotional affect and disorganized thought processes during the earlier evaluations by Drs. French and Rodriguez, as well as Carl Hansen. They also failed to take into account Hoover's almost daily outbursts and agitated behavior while at Juvenile Hall, and the fact that he had been taking psychiatric medication.[13]

The impact of Dr. Buehler's testimony on the jury cannot be overstated. He was the last witness to testify and his opinion would have been the freshest in the jurors' minds when it came time to deliberate. Moreover, unlike Drs. Rodriguez, French and Gould who had been retained by the defense, Dr. Buehler's selection by the court was stressed by the prosecutor as a supposed signifier of Dr. Buehler's superior qualifications and presumptive lack of bias, including an asserted lack of financial motive. (RT 2413: "I charged $150 an hour, I expect $100 an hour, and I accept what the court awards.")

Both his report and his testimony reveal that Dr. Buehler's conclusions were slanted by a lack of information in several regards. First, the prosecutor never

---

13. Both Drs. Gould and Rodriguez testified that, since his transfer to county jail, Hoover had been treated with several antipsychotic and psychotropic medications, including an antidepressant, desrel (sp.), sedatives and sleeping medications, including restoril, valium and dalmane, and an antipsychotic, mellaril. (RT 1885–86, 2268.) According to Dr. Gould, the fact that taking even a low dosage mellaril caused Hoover to feel calmer and more normal was of diagnostic significance because taking an antipsychotic, in any dosage, would be very unpleasant if the person suffered from no thought disorders.

It is striking that Dr. Buehler seemed unaware of Hoover's medication regimen. No mention of medication is made in Dr. Buehler's report or in his testimony. The record in Hoover's possession does not clearly indicate when Hoover began taking each of the prescribed psychoactive medications. Even so, it is difficult to see how Dr. Buehler could have made an accurate assessment of Hoover's incustody conduct, affect and overall mental status without being furnished full information regarding the medications prescribed to Hoover by the jail physician or psychiatrist. Hoover's claim that the prosecution withheld material information from Dr. Buehler would be substantially strengthened by a determination that it failed to provide the witness with pertinent jail medical records.

shared with Dr. Buehler his theory of the Richards case:

But the most important thing to keep in mind is this:

The relevance of the [Pendragon] information is what was being told the boys. Were they being conditioned in a fashion that they believed this man could do something as preposterous as what we have talked about, and accomplish it? And would it be unreasonable for Mr. Hoover at that point, being exposed to this kind of material, to think that this man could go ahead and plan a murder of his friend, and go ahead and accomplish that?

Crossan Hoover believe[d] sufficiently in [Richards's] ability to weave some type of a story—that he believed sufficiently in Mark Richards that he could kill someone, and he could profit from that killing, and he could *justify it.*

That is the relevance of the material, and it is very, very clear when it shows what he can say and what he can do, *and how he can weave what he wants others to think and believe.*

(Richards RT 2856–2893 (emphasis added).)

At Richards' trial, the prosecutor argued for hours about the "pernicious" influence Richards exerted on the susceptible boys he recruited to the Pendragon plot. His argument made reference to an enormous volume of evidence, both documentary and testimonial to support his theory that Richards had—by guile and threat—systematically manipulated Hoover into doing his bidding. By withholding this information from Dr. Buehler, the prosecutor was able to shape Dr. Buehler's testimony to elicit the desired conclusion that Hoover's motivation for the killing was money alone. Indeed, the prosecutor posed not a single question about Pendragon to Dr. Buehler. The only brief reference to Pendragon was made when, in response to the prosecutor's question, "Did you ask him why he killed Mr. Baldwin," Dr. Buehler was allowed to read Hoover's answer from his [Buehler's] report. (RT 2425–26.)

According to Dr. Buehler, Hoover stated that he was in a Pendragon plan to take over Marin County and that [Baldwin's] money would be used to get his mother to move back to Marin from San Francisco County. (RT 2427.)

Dr. Buehler had read some of the newspaper articles regarding Pendragon and had concluded that there was no actual plan underway. (RT 2463.) Thus, the first time Dr. Buehler was given any inkling of the reality and intensity of the Pendragon plot—and its grip on the young men involved—was during the defense cross-examination. The defense examination included a series of dense and complicated hypotheticals regarding Pendragon, with a recitation of the evidence, including weaponry found in Richards' possession. (RT 2463 *et seq.*) However, the hypotheticals had no evidentiary force and Dr. Buehler was free to reject them factually, which he did. Also, the hypotheticals presented a barrage of information that Dr. Buehler could not have been expected to process while he was on the witness stand. As Dr. Buehler explained: "To give you some impressions about Mr. Richards which, of course, I'm not prepared to do by virtue of having no—nothing other than sketchy information. . . ." (RT 2482.) Finally, because the hypotheticals were overly complicated and long, their point got lost along the way as well.

The Pendragon evidence was not the only key information withheld from Dr. Buehler by the prosecution. One of the most compelling indications that Hoover was transiently insane during the assault on Baldwin is his description of what occurred. According to Dr. Rodriguez, Hoover was hallucinatory or had lost touch with reality when he perceived that Bald-

win continued to talk to him even after the fatal blow to the head. (RT 2265.) The same was true of Hoover's belief that the screwdriver penetrated Baldwin's eye socket and "scrambled his brains." (RT 2265.) Both these grotesque perceptions were contradicted by the autopsy report which established that Baldwin probably died after the first blow to the head and that there was no damage to the eye or the head consistent with the insertion of a screwdriver. (RT 457–58.)

Nevertheless, Dr. Buehler confidently testified that he had "no reason not to believe Mr. Hoover's report at that time." (RT 2429.) In actuality, Dr. Buehler would have had every reason to doubt Hoover's account of the killing had he been provided with the autopsy report or the pathologist's testimony. Clearly, the prosecutor obtained a significant advantage by not giving Dr. Buehler the autopsy information, thereby allowing Dr. Buehler to truthfully opine that he had seen no evidence that contradicted Hoover's recollection of events.

Finally, it is evident that Dr. Buehler was not provided with accurate information regarding Hoover's troubled emotional state and uncontrolled behavior while in juvenile custody. From his testimony, it seems that Dr. Buehler was unaware of Hoover's suicide attempt—by hanging—while at Juvenile Hall. (RT 2425: "Suicidal gestures .... I have some question about this. He has held a piece of glass to his wrist.... He has made suicidal ideational comments, but I know of no gestures.") Without this background, Dr. Buehler could, mistakenly but in good faith, portray Hoover as generally rational, calm and cooperative.

Thus, by withholding an array of relevant information from Dr. Buehler, the prosecution was able to elicit forceful, un-

wavering expert testimony to support the prosecution's theory at Hoover's trial that the motive for Baldwin's killing was money, and only money. Dr. Buehler's opinions differed fundamentally from those offered by the other mental health experts. Every other mental health professional who testified concluded that Hoover had a mental disorder—borderline personality disorder—and that under stress, he could experience a brief period of psychotic functioning. (See, e.g., RT 2752.)

When the court appointed Dr. Buehler, it also appointed another psychiatrist to evaluate Hoover's sanity at the time of the offense, Joseph Gustadt, M.D., Dr. Gustadt, accordingly, was cloaked with the same presumptions of neutrality and heightened expertise as Dr. Buehler.

The prosecution called Dr. Gustadt as a witness only in the sanity phase, where he narrowly supported the prosecution's position, but not in the guilt phase, where he would have contradicted Dr. Buehler's opinions in key respects. First, Dr. Gustadt, who examined Hoover at about the same time as Dr. Buehler, concluded that Hoover suffered from borderline personality disorder, which included among its symptoms a reality testing deficiency. (RT 2746–47.) As explained in Dr. Gustadt's report: "if forced to experience severe anxiety, [Hoover's] ego functioning regresses markedly and his reality testing becomes defective." (RT 2752.) The regression could produce a brief period of psychotic functioning. (RT 2752.)

Dr. Gustadt also testified that the primary reason for the killing was Hoover's need to please Richards, whom he idealized. (RT 2749.) Indeed, in terms of some of the dynamics, Dr. Gustadt did not think it too farfetched to compare Hoover's relationship with Richards to the Jonestown [14] situation. (RT 2752.) At the time

14. Jonestown, a colony in Guyana established

by charismatic minister Jim Jones, gained

of Hoover's trial this horrific example of the destructive influence of a cult leader would have been relatively fresh in the jurors' minds.

Consequently, a successful prosecution was wholly dependent on Dr. Buehler's testimony to counter the expert consensus regarding Hoover's mental condition and motivation for the offense. To ensure that Dr. Buehler would support his theory of the case, the prosecution withheld information from the witness that would have brought his conclusions into conformity with those of the other expert witnesses.

Although not false in the classic sense, Dr. Buehler's testimony was nevertheless severely tainted by the prosecution's manipulation of the evidence. The fact that Dr. Buehler was not complicit in the misconduct enhances rather than diminishes the prejudicial effect of the prosecution's tactics. *Hayes,* 399 F.3d at 981.

### IV. Conclusion

The jury instruction on insanity was improper under *Skinner.* The error was not harmless, and the state court of appeal relied on an unreasonable construction of the facts in reaching its decision. The jurors would in all likelihood have returned a verdict of not guilty by reason of insanity if they had been given the proper instruction. The petition on this claim is granted.

Defense counsel was arguably ineffective, but his conduct was not objectively unreasonable. The prosecution's theories were inconsistent but not necessarily irreconcilable and hence did not violate Hoover's right to due process. Accordingly, these claims are denied.

The prosecutor's manipulation of the evidence provided to his expert, Dr. Buehler, so distorted the expert's testimony as to

amount to false evidence. The expert's testimony undoubtedly swayed the jurors, who spent more time on the sanity deliberations then they did on the guilt deliberations. If Dr. Buehler had been provided with all the Pendragon evidence, the autopsy report showing the disconnect between Hoover's recollection of the killing and the actual wounds suffered by the victim, his suicide attempt while in custody, his anti-psychotic medication between the arrest and Dr. Buehler's interview, then by his own admission his report would have been radically different. Dr. Buehler's testimony weighted the evidence unfairly against Hoover. Hoover meets his burden of showing that this testimony would have made a difference in the jury's verdict, and the Court after de novo review of the record must and does grant the writ.

Accordingly, the petition for writ of habeas corpus is hereby GRANTED. The conviction is vacated and Respondent is ordered to release Petitioner Crossan David Hoover, Jr. from custody within 60 days from the date this order is filed, unless the State of California reinstitutes criminal proceedings against him.

A copy of the order shall be sent to the Public Defender of Marin County.

The Clerk shall close the file.

IT IS SO ORDERED.

---

lasting *international notoriety in 1978, when nearly its whole population died in a mass murder-and-suicide ordered by Jones. Over nine hundred men, women and children were slain, Jones among them.*